[S. F. No. 9274. In Bank.—July 28, 1921.]

CITY OF OAKLAND (a Municipal Corporation), Appellant, v. GREAT WESTERN POWER COMPANY (a Corporation, Respondent.

[S. F. No. 9275. In Bank.—July 28, 1921.]

CITY OF OAKLAND (a Municipal Corporation), Respondent, v. GREAT WESTERN POWER COMPANY (a Corporation), Appellant.

[1] PUBLIC SERVICE CORPORATIONS—SUPPLY OF CITY WITH ELECTRICITY FOR LIGHTING PURPOSES—SUBSEQUENT MUNICIPAL FRANCHISE FOR SUPPLY FOR ALL PURPOSES—CONSTITUTIONAL FRANCHISE NOT SURRENDERED.—A public service corporation supplying electricity to a municipal corporation and its inhabitants for lighting purposes under the franchise provided by section 19 of article XI of the

constitution did not lose or surrender such franchise by subsequently bidding for and accepting a franchise from the municipality under a charter provision, for the supplying of electricity for light, heat, power, and all other purposes, and a provision of the franchise for the payment to the city of a percentage of the gross receipts was invalid as to revenue received from the furnishing of electricity for lighting purposes.

[2] MUNICIPAL CORPORATIONS—CONDITION OF BIDDING FOR FRANCHISE—AGREEMENT OF SALE TO CITY—UNWARRANTED REQUIREMENT.—A municipal corporation has not the right to exact of a public service corporation owning a perpetual franchise for the furnishing of the city and its inhabitants with electricity for lighting purposes and owning another franchise for furnishing the city and its inhabitants with electricity for power and heat, an agreement that the corporation make a sale of its system to the city at the end of thirty-five years, as a condition to its right to bid for a municipal franchise for the furnishing of the city and its inhabitants with electricity for all purposes, notwithstanding a charter requirement that such a provision be inserted in every ordinance granting a franchise.

[3] PUBLIC SERVICE CORPORATIONS—ACCEPTANCE OF MUNICIPAL FRANCHISE—PRIOR FRANCHISE UNDER BROUGHTON ACT NOT SUPERSEDED. The acceptance by a public service corporation of a municipal franchise for furnishing the city and its inhabitants with electricity for light, heat, power, and all other purposes, which franchise was sold to the highest bidder under charter requirement, did not operate to supersede a prior franchise for heat and power granted to the same corporation by sale at public auction under the Broughton Act (Stats. 1905, p. 777), so as to require payment to the city of a percentage of the gross receipts under the prior franchise.

[4] ID.—PERCENTAGE ON SALES OF ELECTRICAL ENERGY — DELIVERY OUTSIDE OF CITY LIMITS.—A municipal corporation is not entitled, under a franchise requiring a public service corporation to pay to it a percentage of its gross receipts on all electrical energy sold within the city limits, to a percentage on energy delivered to a customer at the junction of the lines of the seller and consumer outside of the city limits, although the meters were within such limits.

[5] ID.—RESALE WITHIN LIMITS—RIGHT TO PERCENTAGE.—A municipal corporation is not entitled, under a franchise requiring a public service corporation to pay to it a percentage of its gross receipts on all electrical energy sold within the city limits, to a percentage on energy delivered within such limits by a customer upon a resale.

APPEALS from a judgment of the Superior Court of Alameda County. Everett J. Brown, Judge. Reversed.

The facts are stated in the opinion of the court.

H. L. Hagan, City Attorney, and John Jewett Earle, Assistant City Attorney, for Appellant in No. 9274 and for Respondent in No. 9275.

Guy C. Earl and W. H. Spaulding for Respondent in No. 9274 and for Appellant in No. 9275.

Roy V. Reppy, B. F. Woodard, E. W. Cunningham and George E. Trowbridge, *Amici Curiae.*

WILBUR, J.—We adopt as correct the statement of facts and of the issues prepared by Mr. Justice Richards in the opinion of the district court of appeal, first district, first division, as follows:

"This action was instituted by the city of Oakland to recover from the Great Western Power Company, a public service corporation, certain moneys alleged to be due the plaintiff under and by virtue of a certain franchise awarded by it to the defendant in the year 1913, after due proceedings for its advertisement and sale. Under the terms of said franchise the defendant was permitted to occupy and use the streets of said municipality for the transmission and distribution of electricity for furnishing light, heat, and power, and for any and all other uses to which electricity may or can be put; and said franchise provided that for the exercise of the rights and privileges granted thereunder, the grantee thereof was to pay to the grantor certain graduated percentages of its gross annual receipts resulting from the sale of electricity under said franchise and during the life thereof within the limits of the municipality.

"Upon the trial of the action, certain stipulations were entered into between the parties as to the specific quantities of electric energy involved during the period covered by the plaintiff's claim for light and heat and power respectively; and also as to the gross annual receipts of the defendant from the sale of these respective forms of electric energy, which stipulations remove these matters from controversy. The issues in dispute between the parties were thus narrowed to the question as to how much of the entire gross annual receipts of the defendant from its sales of electric energy in

these several forms within said municipality was received by
it for electricity distributed by it under said franchise, and
upon which it was bound to pay the percentages to recover
which this action was brought.

"The claim of the defendant with respect to this question
was, at the trial, and is here, that a large portion of its gross
annual receipts were derived by it under and by virtue of
its possession of certain earlier franchises for the distribu-
tion of electricity within said city, which did not provide
for the payment of the percentage which the plaintiff here
sought to recover; and the defendant made and makes the
further claim that as to a certain *quantum* of electricity sold
by it to a particular customer it was not sold or delivered
within said city, and hence, upon that particular transac-
tion, no percentages were due.

"These claims on the part of said defendant were based
upon the following facts: In the year 1908, the defendant
having been organized as a corporation for the purpose of
the distribution of electric energy . . . [installed] a dis-
tributing system for the purpose of furnishing electric light
to the said city and its inhabitants by virtue of its right to
do so under the provisions of section 19 of article XI of the
state constitution; and, having installed such system, pro-
ceeded to furnish said city and its people electricity for
lighting purposes under its said constitutional franchise; in
the year 1909 the said defendant applied to said municipal-
ity for a further franchise for the supply and sale of electric
energy in the forms of heat and power within its limits.
This application was made under the so-called Broughton
Act (Stats. 1905, p. 777), which expressly provided for the
granting by municipalities of franchises for the distribu-
tion of electric energy for heat and power; and the same
was granted by said city. The franchise thereupon issued
provided, in accordance with the terms of said act as it read
at the time of said grant, that work under the franchise
must be completed within three years. . . . The term of this
franchise was fifty years, and it provided for the payment
by its grantee of two per cent of the gross annual receipts
derived under its exercise, commencing five years after the
date of the franchise and continuing at said rate thereafter
during its life. The defendant began operations under this
franchise, using in the main the same distributing system

employed by it under its constitutional franchise for furnishing light within said city. In the year 1911 section 19 of article XI of the state constitution was so amended as to eliminate the so-called constitutional franchise provision thereof, and to commit to municipalities the power to establish and operate their own public works for supplying light, water, power, heat, etc., to their inhabitants, or of granting franchises to private persons or corporations so to do under such conditions as might be prescribed in their organic law. Following this amendment to the constitution the serious question arose as to whether the constitutional franchise or privilege, which was in the course of exercise by many public service corporations in most of the municipalities of this state, had not been thereby terminated, at least in so far as any future extension of their distributing systems established and in use thereunder was concerned. This controversy came before the supreme court of this state in the *Matter of Russell, on Habeas Corpus,* 163 Cal. 668, [Ann. Cas. 1914A, 152, 126 Pac. 875], wherein it was decided that the constitutional privilege to occupy the streets of municipalities, exercised under the provisions of the original section of the constitution, could not be held to cover or permit extensions of a distributing system in operation thereunder after said amendment, and to streets not occupied and used for such purposes prior to the taking effect of such amendment. The decision of our supreme court to this effect was handed down in September, 1912. The matter was thereupon taken before the supreme court of the United States upon a writ of error for final determination, and was determined by it in the case entitled *Russell* v. *Sebastian,* 233 U. S. 195, [Ann. Cas. 1914C, 1282, L. R. A. 1918E, 882, 58 L. Ed. 712, 34 Sup. Ct. Rep. 517, see, also, Rose's U. S. Notes], decided April 6, 1914, in which decision the latter court disapproved the conclusion of the supreme court of this state, and in so doing decided that the amendment to the constitution of California above referred to, and the ordinance of the city of Los Angeles passed subsequent thereto, in nowise impaired constitutional franchises in course of exercise prior to such amendment, and under which the holders thereof were entitled to hold, maintain, and extend their distributing system established and in operation prior to such amendment.

"The trial court in the instant case took cognizance of the matters involved in these two decisions, and made an express finding to the effect that during the pendency of the *Matter of Russell* in the supreme court of this state and in the supreme court of the United States during the years 1912, 1913, and 1914, the defendant herein took an active part in the presentation of said matter on behalf of said Russell and with a view to having his contentions sustained. By this finding the trial court placed the defendant herein in the attitude, during the years above mentioned, of actively and strenuously contending for the full validity of its constitutional privilege or franchise for supplying electric light to the city of Oakland and its inhabitants which it had been exercising prior to said amendment to the constitution, and of its full right to make extensions of its distributing system within said city for lighting purposes under said franchise and notwithstanding said amendment. The significance of this finding of the trial court consists in the fact that during the year 1913, and specifically upon the twenty-second day of March of that year, the said defendant made and filed an application before the city council of the city of Oakland, expressing the desire of the defendant to acquire a municipal franchise from said city for the transmission and supply of electricity for use in the forms of light, heat, and power, and for all other uses to which electricity may or can be put, and for the erection, construction, and maintenance and operation of such a distributing system within said city as would enable it so to do; and said defendant in its said application requested said official body to take such legal steps as would be proper to enable the applicant to acquire such franchise. This application was accompanied with a form of ordinance suggested for adoption, embodying the form of the desired franchise, and providing for such advertisement and sale thereof as was required by law. The city council of said city acted upon said application favorably by adopting the proper ordinance for the advertisement and sale of said franchise substantially in the form suggested by the defendant, and said franchise was thereafter duly offered for sale. The only bidder therefor was the defendant, and its bid conformed to the terms of the proposed franchise in respect to the percentages of gross annual receipts of the successful bidder therefor arising from its exercise. On the ninth day of

June, 1913, the said city council, by an ordinance regularly adopted, duly awarded to the defendant said franchise, and the said defendant then and there duly accepted and received and has ever since possessed and owned the same.

"The trial court, having found substantially the foregoing facts, made and filed its conclusions of law thereon, and in so doing held in effect as follows: As to the gross annual receipts of the defendant derived through its distributing system from the sale and supply of electric light to the city of Oakland and its inhabitants, the court held that these receipts of the defendant were derived by it through its ownership, possession, and exercise of its constitutional right, privilege, or franchise for supplying electric light to said city and its people, and that constitutional right, privilege, or franchise was not waived or surrendered or withdrawn by said defendant through its application for or by the grant to it of the municipal franchise of 1913, and hence that none of said gross annual receipts of the defendant derived from the sale and supply of light to said city or its people were derived from or through the exercise of said last named franchise, and that the city of Oakland, the plaintiff herein, was therefore not entitled to collect or receive any portion of defendant's annual receipts derived from its sale and supply of electric light within said city. The trial court further held that as to the municipal franchise for the sale and supply of electric energy in the form of heat and power granted to said defendant by said city on the twenty-fifth day of October, 1909, and under which it had thereafter engaged in such sale and supply of electric heat and power in said city, the said exercise of such franchise and its operation thereunder ceased by virtue of the grant to an exercise by said defendant of the franchise sold and granted to it on the ninth day of June, 1913, and that said defendant had not since said last-named date sold or delivered any electric energy for heat and power within said city under said franchise of 1909, but that all of its sales and deliveries of electric heat and power within said city had been made under and by virtue of the franchise of June 9, 1913, and that all of the defendant's gross annual receipts derived from the sale and supply of heat and power within said city were received by it under and by virtue of the exercise of the said franchise of 1913, and hence that

the said plaintiff was entitled to have and recover from said
defendant the percentage of said gross annual receipts
derived by it from this last-named source. Judgment was
therefore ordered in favor of the plaintiff for the aggregate
amount of said percentages. The trial court further held
that as to certain sales and deliveries of electric energy for
use otherwise than for lighting purposes to the Pacific Gas
and Electric Company, and designated as the 'Moraga' sales,
such electric energy was delivered to said last-named cor-
poration within the limits of the city of Oakland, and hence
that the plaintiff was entitled to receive the percentages
stipulated in its franchise of 1913 upon the gross annual
receipts of said defendant derived from such so-called 'Mor-
aga' sales; and ordered and entered judgment accordingly
for the accumulated sum of such percentages.

"From the judgment of the trial court in plaintiff's favor as
above set forth the defendant has appealed; while from that
portion of said judgment which is in the defendant's favor,
in so far as the court has denied to said plaintiff the right
to collect any percentages upon the gross annual receipts of
the defendant derived from the sale and supply of electric
light within said city, the plaintiff has also taken an appeal.

"The record in these two appeals has been by stipulation
of the parties presented in one transcript, and it is agreed
that they may be heard and determined together.

"The sole question presented upon the plaintiff's appeal
is that relating to the correctness of the ruling of the trial
court upholding the validity and vitality of the defendant's
so-called constitutional franchise, and declaring the defend-
ant's sales and deliveries of electric light within the city
of Oakland to have been wholly made thereunder and not
under or by virtue of the franchise of 1913. There are two
contentions of the defendant upon its appeal, the first being
that the trial court was in error in its holding that the de-
fendant's deliveries of electric energy in the forms of heat
and power to the city of Oakland and its inhabitants were
made under the franchise of 1913; and its second conten-
tion being that as to the 'Moraga' deliveries the uncon-
tradicted evidence showed that these were made outside
of the limits of the city of Oakland, and that said defend-
ant was therefore not liable to pay any percentages upon
its gross annual receipts derived from that source.''

The Gross Receipts from Electricity Furnished for Lighting Purposes.

[1] It is admitted that under the decision of the United States supreme court in *Russell* v. *Sebastian, supra,* the Great Western Power Company at all times after 1908 had a franchise which enabled it to furnish electricity for lighting throughout the whole city of Oakland. The contention of the city is that by the application for the franchise in 1913 and by the acceptance of a franchise which covered the whole city (with the exception of a certain district), the defendant thereby surrendered its constitutional franchise in lieu of the franchise granted in 1913. Whatever justification there might be for this theory, if the granting of the franchise of 1913 had been a result of mutual bargaining between the parties, assuming that they stood on the same basis as private persons negotiating for similar rights and entering into a new contract with relation to those rights, there is absolutely no justification for the extension of this theory to the facts involved in this case where the grant of the franchise of 1913 as well as that of 1909 was required to be to the highest bidder at public auction. The applications of the defendant to the council of the city of Oakland to offer for sale at public auction the form of franchise proposed by it merely set in operation the machinery provided in the charter act for the sale of franchises (Charter of Oakland, art. XX, Stats. 1911, p. 1628). The applicant for such a franchise, if he bids at the sale, stands upon no different footing from any other individual in the community who may be a prospective buyer of the franchise.

The charter in effect at the time of the sale of the 1913 franchise provided that the franchise should be sold to the "bidder offering to pay to the city during the life of the franchise, permit or privilege, the highest percentage of the gross annual receipts received from the use, operation, or possession of the franchise, permit or privilege, provided that such percentage be not less than two per cent of said gross annual receipts during the first five years," etc. (Sec. 140, subd. 2, art. XX, of the Charter, Stats. 1911, p. 1629.)

[2] It is difficult to see upon what theory the purchase by the defendant of this franchise, either directly from the city or from some purchaser of the franchise at public auction,

could in anywise affect a right which it theretofore owned. There is no provision in the franchise requiring the surrender to the city of other franchises. There was no agreement in the application or at any other time on the part of the defendant to surrender such franchise and the charter does not require such surrender. We cannot understand how the purchase of such franchise by the defendant can be justly made a basis for a claim that it thereby agreed to pay two per cent of the gross returns from the operation of the properties and franchises theretofore owned and operated by the purchaser. On the contrary, the charter required that the bidding should be on the basis of the annual receipts derived from the possession of the franchise so purchased (subd. 2, *supra*), and not from the possession of prior franchises. Neither the franchise granted by the city nor that granted by the constitution was exclusive. The ordinance granting the franchise expressly provided that it was not an exclusive privilege. If the franchise offered for sale had been purchased by some competitor of the defendant, there was no reason why the defendant could not continue to operate under its constitutional franchise and no legal reason why it could not again apply to the council to advertise a new blanket franchise covering the city. The whole scheme for the sale of franchises at auction upon competitive bidding is opposed to the theory that the purchaser of the franchise surrenders any right it theretofore had, merely by purchase at such sale. It is not contended that the defendant surrendered its rights by the application for the franchise, nor would it be contended that it surrendered its rights to some other bidder for the franchise if it had been unsuccessful in the competition. At what point, then, can it be said that the defendant surrendered its constitutional franchise to the city?

The answer presented by the city is: "At the time it acquired the new franchise," but this answer ignores the fundamental requirement of competitive bidding for all franchises.

The city makes the point that certain sections of the ordinance granting the franchise of 1913 show an intention to substitute the new franchise for the old. For instance, the franchise of 1913 contains an agreement by which the grantee obligates itself to sell to the city for cash, all prop-

erty used in the enjoyment of the franchise (sec. 16). This provision of the franchise was required by the charter to be inserted in every ordinance granting a franchise (Charter of Oakland, sec. 145 of art. XX, *supra*).

This point is answered by the fact that the ordinance granting a franchise is not the result of mutual bargaining from which it might well be inferred that the defendant was agreeing to sell all its property to the city, but is a general proviso applicable alike to all prospective purchasers, and, therefore, to be construed only as applicable to property used in the exercise of the particular rights granted by the franchise and not otherwise owned or acquired. To require a purchaser owning a perpetual franchise to distribute electricity for light, and another to distribute electricity for power and heat, to agree to sell that system at the end of thirty-five years, long before its rights to so distribute electricity for light, heat, and power terminated under its other franchises, as a condition of bidding for the new 1913 franchise would be obviously putting such a purchaser at a great disadvantage as compared with other bidders owning no system and no rights, and would require a consideration from it wholly out of proportion to that tendered by other bidders. The contention that the defendant, by bidding in this franchise, in effect agreed to surrender a perpetual franchise, and a fifty-year franchise, and agreed to sell its property in thirty-five years, and that the agreement so to do is a consideration for the new franchise, if sustained, shows that the city was requiring from this bidder a consideration it had no right to require or to exact, for the only consideration the city was authorized to accept in such competitive bidding was a percentage of the gross receipts to be derived from the franchise sold. The basis upon which the percentage was to be computed is the same in the case of each bidder. This contention of the city cannot be sustained if the fundamental principle of equal competitive bidding for franchises be conceded, as it must be in the light of the express requirements of the charter (sec. 140, subd. 5, art. XX, *supra*). Furthermore, as its bid of percentages would cover the receipts from its plant and distributing system already installed, which amount the city is seeking to recover in this action, while another competitor would be compelled to pay only on the revenue from its

plant subsequently installed, it is apparent that a bid of two per cent from a corporation with a larger business already developed would be vastly greater in proportion than that of a similar percentage from a bidder that might take years to develop its system to the point already attained by its competitive bidder.

On the other hand, suppose that the defendant's constitutional franchise required an annual payment to the city of five per cent of the gross returns, would it be contended that the defendant by bidding in a blanket franchise requiring no payment for three years, and two per cent thereafter, would thereby be released from the payments due under its original franchise where it continuously occupied the streets with its poles and wires and conducted its business? Assuredly not. If it did not terminate its duties under the old franchise it is equally clear that the mere bidding in of such a blanket franchise did not terminate its rights thereunder.

Other points of the city based upon an analysis of the terms of the franchise of 1913 are met by the same considerations and, therefore, need not be considered in detail.

There is no basis whatever, in law or in fact, for the contention that the defendant's rights and duties under its old franchise terminated by the acceptance of the new. The customers of the defendant were entitled to be served under the terms of the old franchise, a right derived by them from the constitution, and the people in the district not yet served by the defendant were entitled to the same privilege (*Russell* v. *Sebastian, supra*). These mutual rights and duties should not be deemed impaired or terminated by mere inferences derived from circumstances that defendant applied for and subsequently bid in a new franchise duplicating in part rights it already enjoyed and was entitled to continue to exercise. The situation presented by the record is simply this:

The defendant at all times since 1908 has had the right by an express grant to it by the constitution of the state to serve the inhabitants of the city of Oakland with electricity for lighting purposes.

All revenues derived from the sale of electricity for light are revenues derived by the corporation by reason of its constitutional franchise and not by reason of the franchises

subsequently obtained from the city for the distribution of electricity for lighting purposes.

If it should be held that the franchise of 1913 had any effect upon the prior right of the bidders, it would follow that there could be no equal and competitive bidding.

The charter expressly provides that franchises shall be so framed that there shall be no direct or indirect restriction upon free and open competition in bidding therefor (art. XX, sec. 140, subd. 5, *supra*).

The Great Western Power Company, if compelled by its bid to surrender its perpetual franchise for the distribution of electricity for lighting purposes, could not afford to bid as much for the franchise as some other bidder who had no such interest at stake, and the same would be true with reference to any other owner of a franchise which would be included in the blanket rights covered by the franchise of 1913. Hence no such surrender can be implied.

The city relies very strongly upon the case of *City of Hanford* v. *Hanford Gas etc. Co.*, 169 Cal. 749, [147 Pac. 969], while the defendant relies with equal assurance upon the decision in the *Town of Suisun City* v. *Pacific Gas & Electric Co.*, 35 Cal. App. 380, [170 Pac. 1078]. We will refer to the former as the Hanford and to the latter as the Suisun case. The question involved in the Hanford case is altogether different from that involved in the case at bar. In that case suit was brought by the city to recover from the holder of a franchise for heat, light, and power, the two per cent of the gross annual receipts arising from the use of the franchise. The defendant demurred to the complaint, making no issue upon the allegation of the complaint that the receipts sought to be recovered were derived from the franchise, but claiming that by reason of its holding a constitutional franchise it had the right to distribute heat and power as well as light. This contention was determined against the defendant and it was held that the franchise gave the right for heat and power distribution, something which the company did not possess under the constitution. The question answered in that case is thus stated in the decision: "Did the defendant in accepting this franchise from the City of Hanford acquire anything of value?" Instead of supporting the contention of the plaintiff it is apparent from the decision, taken as a whole, that the court con-

sidered that there was no inconsistency between the grant for light, already owned by the gas company, and the right to distribute gas for light and power purposes, covered by the new franchise.

The Suisun case was an action similar to the one at bar brought by the city to recover a percentage of the gross receipts from a franchise granted by the board of trustees of Suisun for light and power purposes to one Prior, who had theretofore been distributing electricity for lighting purposes under the constitutional franchise. It was held that the grant by the city for lighting purposes was void and in conflict with the constitutional franchise, and that the obligation to pay two per cent did not arise on the electricity distributed for lighting purposes. A petition for hearing in this court was denied in the Suisun case. The only distinction between that case and the one at bar favorable to the contention of the plaintiff is that subsequent to the grant of the franchise in the Suisun case the constitution of the state was amended (Const., art. XI, sec. 19). On the other hand, it is urged that the city of Oakland was not by such amendment vested with authority to grant franchises for the distribution of electricity for lighting purposes, and, therefore, that the rule in the Suisun case is still applicable. In view of our conclusion that the defendant has the right to furnish electricity for lighting purposes under its constitutional franchise and is not required to pay two per cent of its gross return therefrom, we deem it unnecessary to further discuss the authoritative force of either the decision in the Hanford or the Suisun case. Neither of these cases is opposed to the conclusion reached by us.

### Right to a Percentage of the Gross Receipts Under the Franchise of 1909.

[3] The question is, whether the franchise granted the defendant in 1909 by sale at public auction in accordance with the Broughton Act (Stats. 1905, p. 777) is still in effect or whether the acceptance of the franchise of 1913 operated to supersede the prior franchise.

What we have said with reference to the effect of the grant of the franchise of 1913 upon the constitutional franchise theretofore owned by the defendant is largely determinative of the question here involved. The franchise of

1909 was for a fifty-year period and for the distribution of electrical energy for heat and power purposes only. It was believed by the defendant that the right to continue construction under this franchise terminated in three years. The new franchise, so far as the distribution of electricity for heat and power was concerned, was desired to cover those districts in the city not theretofore occupied by the power lines of the defendant, in view of the termination of the right to continue construction under the franchise of 1909. There is no dispute as to the amount which would be due on the theory that the ordinance of 1909 remained in full force and effect as these amounts were stipulated before the trial court. What we have said with reference to competitive bidding applies with equal force to the rights of the defendant under the franchise of 1909, although the Broughton Act differs somewhat from the charter. If, as a condition of bidding, or as a result of the acceptance of the new franchise, the rights of the defendant under the old franchise of 1909 were thereby surrendered or lost, then it would follow that the bidding was not competitive. The defendant could only bid at the hazard of losing rights it already possessed while other persons or corporations could bid without such hazard. There is no inconsistency in the ownership by the defendant of rights under several distinct franchises. The parties have been able to stipulate in dollars and cents the return to the city from the respective franchises, if all are still in existence, and there is nothing in the nature of such franchises to justify the conclusion that the acceptance of the later franchise was a surrender of the earlier franchise. The only difference between the defendant as a purchaser of the franchise and any other bidder is that the acceptance of the franchise by the defendant enables it to furnish the heat and power to customers and in districts not theretofore served under the franchise of 1909 without duplicating poles and wires in the districts theretofore served.

The conclusion of the trial court was erroneous upon this branch of the case.

This conclusion is fortified by the fact that the franchise of 1913 made no reference to existing construction but was framed upon the theory of additional and new construction to be commenced within four months of the

date of the granting of the franchise, and therefore had no application to rights under a previous franchise and construction already erected thereunder.

## As to the Percentage upon Deliveries to the Pacific Gas & Electric Corporation at Moraga.

[4] It appears from the evidence without question that the defendant corporation sold electric energy to the Pacific Gas & Electric Company. A portion of this power was delivered from the power lines of the defendant company to the power lines of the Pacific Gas & Electric Company at a point named Moraga outside of the city limits of the city of Oakland. Under both the franchises of 1909 and 1913 the payment of a percentage by the defendant to plaintiff was only "upon the gross annual receipts resulting from the sale of electric energy delivered within the limits of the city of Oakland." The contract between the defendant and the Pacific Gas & Electric Company provided for a delivery "at the junction of the power company's main electric transmission lines and the main electric transmission lines of the consumer, about eight miles southeasterly from said Ridge station." This point is known as Moraga. It was also provided that the meters and measuring instruments for measuring the power delivered at Moraga should be installed in the power company's electric substation in said Alameda County, known as its "Fourth Avenue substation." It is clear, however, that so long as the electricity remained on the power lines of the defendant that it was not delivered to its customer, the Pacific Gas & Electric Company. Obviously, the point of delivery was the junction of the lines of the two systems as was expressly provided in the contract between them. The fact that there was power line loss between the measuring station and the point of delivery is of no significance whatever. Such loss is a known quantity and the amount of electricity delivered at the point of intersection of the two power lines could be as accurately determined by a meter several miles away as by a meter at the point of delivery. Both the contract and the physical facts demonstrate that the point of delivery was outside the city of Oakland and consequently not within the terms of the franchise. [5] A point is made by the plaintiff that some portion of the power delivered by the defendant to the

Pacific Gas & Electric corporation is subsequently returned by that corporation and distributed within the limits of the city of Oakland. Obviously, the defendant is not concerned with the distribution of power by its consumer, and such deliveries by the consumer are not deliveries within the meaning of the franchises held by the defendant. It may be said, however, in connection with this point that the twelve thousand kilowatt hours delivered by the defendant to the Pacific Gas & Electric Company is mingled with the other current flowing in the wires of the Pacific Gas & Electric Company derived from independent sources of power and that only about five hundred kilowatt hours of the total of twenty-five thousand kilowatt hours in the lines of the Pacific Gas & Electric Company is subsequently used within the city of Oakland. This quantity, however, is immaterial to any point involved in this litigation. The court was in error in holding the defendant liable for a percentage of the gross annual returns upon the power delivered at Moraga.

In the event that it was decided that the defendant owns and holds its constitutional light franchise and its franchise of 1909 and 1913 and that the sales of electricity delivered at Moraga are not to be considered in determining the gross earnings of the defendant company, the proper amount of the judgment in favor of the plaintiff and against the defendant was stipulated.

Judgment reversed, with instructions to the trial court to enter judgment in accordance with the stipulation of the parties as to the amounts due under the law as determined by this court.

Shaw, J., Sloane, J., Angellotti, C. J., Lawlor, J., and Lennon, J., concurred.