[Civ. No. 3656.   Fourth Dist.   July 11, 1949.]

THE CITY OF SAN DIEGO, Plaintiff and Appellant, v.
SOUTHERN CALIFORNIA TELEPHONE COMPANY
(a Corporation), Defendant and Appellant.

794

J. F. DuPaul, City Attorney, Shelley J. Higgins and T. B. Cosgrove, Special Counsel, for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Lawler, Felix & Hall, Oscar Lawler, John W. Holmes and Francis N. Marshall for Defendant and Appellant.

BARNARD, P. J.—This action was brought to determine whether or not the defendant, in the operation of its telephone system, is occupying portions of streets in San Diego without a legal right so to do.

The city first adopted a freeholders' charter in 1889. The defendant succeeded to the rights of the Pacific Telephone & Telegraph Company. The latter company and its predecessors had obtained the right to maintain poles, wires and other equipment for telephone purposes over the city streets for 30-year periods, through city ordinances adopted in 1886, 1896 and 1904. In 1914, the Pacific Telephone & Telegraph Company filed a petition with the city requesting the privilege of constructing and maintaining a system of telephone and telegraph wires over, under and along all of the public streets and places "now or hereafter existing" in said city. This petition declared that one of the ordinances under which the company had been operating would expire in 1916; that another would expire in 1926, but that a doubt existed with respect to its validity; and that this application was filed for the purpose of removing any doubts as to the validity of the company's franchises. Pursuant to that application ordinance No. 5681 was adopted July 6, 1914, granting such a franchise and privilege for the period of 30 years. A written acceptance was filed and from its effective date until its expiration on August 7, 1944, the grantee and the defendant, in the operation of its telephone business within San Diego, occupied the public streets and places pursuant to and in compliance with the terms of ordinance No. 5681. Each year

between 1914 and 1929, a statement was filed by the telephone company showing its gross receipts and the amounts due to the city "arising from" the use and possession of the franchise granted by ordinance No. 5681. In 1930, the defendant notified the city that in pursuance of an order of the Railroad Commission the Pacific Company had sold to the defendant and assigned to it certain franchises "among which is Ordinance No. 5681, under which this Company is operating in San Diego." Each year between 1930 and the expiration date in 1944, a similar statement of gross receipts was filed in which it was stated that the defendant was the successor in interest of the franchise granted by ordinance No. 5681. It clearly appears, as the court found, that continuously for a period of 58 years the defendant and its predecessors operated the telephone system in San Diego under city franchises which were applied for and granted, and that by their dealings with the city during that period they inferentially conceded that the city had authority to grant such franchises. From 1914 to 1944, the terms of ordinance No. 5681 were complied with both with respect to the territory within the original city as it existed in 1914, and as that territory was increased by some twenty-seven annexations to the city and a consolidation with East San Diego, all of which took place after April 24, 1916.

In August, 1944, the city notified the defendant that it was maintaining a public nuisance by occupying the streets and public places of the city for its telephone business unlawfully and without permission of the city and that, unless application was immediately made for a renewal of the franchise granted in 1914, or for a new franchise for that purpose, legal proceedings would be instituted to abate the nuisance. No such application having been made, this action was brought. So far as material here, the complaint alleged that the right to occupy the streets and public places of the city for the conduct of a telephone business granted by ordinance No. 5681 had expired on August 7, 1944; that the defendant has failed and refused to apply for a renewal or extension of that franchise, or for a new franchise; that the defendant in carrying on a telephone business within the city is occupying the streets and public places unlawfully, without permission and without having secured a franchise from the city for that purpose; and that demand and notice, as above indicated, has been served upon the defendant. The prayer was for an injunction restraining the defendant from occupying the streets or public

places of the city without first having secured a franchise from the city so to do; that the defendant be ordered forthwith to abate the public nuisance; and for general relief.

The answer, while very long, may be briefly summarized by saying that it denied that the defendant or its predecessors ever operated in San Diego under ordinance No. 5681; denied that that ordinance was ever valid or effective insofar as the operation of any such telephone business is concerned; alleged that the defendant is engaged in operating a general public utility, telephone and telegraph system and service, both intrastate and interstate, and that its operations in San Diego are but a part of a general integrated system of communication which extends throughout the state and, through connecting lines, throughout the United States and foreign countries; alleged that for many years prior to July 16, 1944, and continuously since that time, the defendant and its predecessors have at all times owned a right and franchise granted by the State of California covering the use of all public roads and highways within the state for the installation of telephone and telegraph lines, including the streets and public places in San Diego; alleged that the defendant has continuously used and exercised the rights thus given by the state and pursuant to that right, and not otherwise, has used the streets of San Diego; admitted receipt of the "purported" notice and demand above mentioned; denied that the defendant has created or maintained a public nuisance or that it is occupying the highways and public places of the city without the consent or permission of the city; alleged that its use and occupancy of the streets of the city has at all times been pursuant to, and in acceptance of, the tender and offer made by the state to telephone and telegraph corporations; and denied that it is now occupying the streets and public places of the city for a telephone business, or otherwise, without a franchise so to do.

While the court's findings are voluminous their general effect is to find and hold (1) that with respect to the territory within the original city, before the annexations above referred to, the occupancy and use of the streets for the purposes of the telephone system were and are subject to the control of the city under the provisions of its freeholders' charter; and (2) that with respect to those portions of the city which were annexed to or consolidated with the city subsequent to the reenactment of section 536 of the Civil Code in 1905, such use of the streets is subject to and governed by section 536.

Accordingly, the court entered a judgment which, in brief, ordered the defendant to remove its poles, wires, conduits and other equipment, except those used exclusively for strictly telegraphic service, from the public streets and places within the area which was within the corporate boundaries of the city on March 19, 1905; enjoined the defendant from further occupying the streets and public places in the original city, as thus described; and provided that said order and injunction shall be ineffective if, within 30 days after the judgment becomes final, the defendant shall apply to the city for a new franchise granting permission to thus occupy the streets and public places of the original city, and shall compensate the city at the rate fixed by ordinance No. 5681 for such use of the streets within the original city from August 8, 1944, until the first day of the month immediately preceding the filing of such application. It was further provided that the order and injunction should be ineffective if the city should refuse to grant such a franchise to the defendant, and jurisdiction is reserved to make any necessary modification of the judgment. The defendant has appealed from those portions of this judgment which affect its operations within the original city. The city has also appealed from the judgment insofar as it denied relief to the city with respect to those portions of the present city which were annexed to or consolidated with the city, beginning with the year 1916.

### DEFENDANT'S APPEAL

San Diego adopted its freeholders' charter in 1889. ██ It is well settled that by the 1896 amendment to section 6 article XI of the state Constitution the provisions of such a charter were made paramount and controlling over general state laws with respect to matters which are municipal affairs, and insofar as control over such matters was given to the city by the provisions of the charter. (*City of Pasadena* v. *Charleville*, 215 Cal. 384 [10 P.2d 745]; *City of San Jose* v. *Lynch*, 4 Cal.2d 760 [52 P.2d 919].) The controlling questions on this appeal are whether such use of the streets as that here involved is a municipal affair, within the meaning of the constitutional provision, and whether a right to control such use was included in the provisions of the 1889 charter.

The defendant contends that its use of the city streets, here in question, is not such a municipal affair. While many points are incidentally argued the defendant mainly contends in this connection that it operates a state-wide system of tele-

phone communication, tying the state together; that the right of such a system to exist necessarily involves its right to use the city streets; that a city's right to evict the system from such use of city streets would adversely affect the entire state; that modern developments and improvements in telephone service, with its extension to and importance in all business carried on in the state, have changed the question of street usage for that purpose from a matter of local to a matter of state control; that section 536 of the Civil Code, since its amendment in 1905, has given the right to a telephone corporation to install its poles and lines upon any public road or highway in the state; that this statute expresses the state's concern in state-wide telephone service and determines, as a matter of state policy, that such use of the streets is a state affair; that this being now a state affair the state statute applies and controls with respect to the streets of the city also, regardless of any provisions in the city charter; and that while the city still has certain police powers it has no power to interfere with or stop the service being rendered by this state-wide system, this being a matter which is entirely within the control of the Public Utilities Commission.

It is also argued that the state's concern in the matter of the use of city streets for purposes affecting the entire state is further evidenced by the fact that the State Highway Department has taken control of many streets in connection with the establishment of through highways; that these various developments reflect a different theory of utility status, now regulated by a state agency, and of control over the use of city streets which has come about since the decision in *Sunset Tel. & Tel. Co.* v. *Pasadena,* 161 Cal. 265 [118 P. 796]; that that case was decided on the *pro tanto* theory (that section 536 granted a franchise on different roads progressively as the state's offer was accepted by the installation and use of equipment), which theory was later abandoned; that this Pasadena case has, in effect, been overruled or outmoded; that as early as 1920 a contrary view was taken in the case of *Ex parte Daniels,* 183 Cal. 636 [192 P. 442, 21 A.L.R. 1172], which recognized that the use of city streets as part of a highway system had become a matter of state-wide concern; that this view has been followed in many later decisions, including *County of L. A.* v. *Southern Cal. Tel. Co.,* 32 Cal.2d 378 [196 P.2d 773]; that the latter case recognized that municipal affairs change with conditions, that a telephone company's right to use the streets is a state-wide entity, and its use of

streets is not exclusive because it uses them only to the extent necessary to serve the public, and is not permanent since it may be ordered to move its poles; and that since the use of city streets here involved is no longer a municipal affair it follows that section 536, as amended in 1905, granted a franchise to the defendant's predecessors which was state-wide and which is effective and controlling with respect to the use of the city streets in San Diego.

It may first be observed that while there has been a tremendous development and change in the breadth and scope of telephone service under modern conditions, the resulting interference with the primary use of such streets by the public has correspondingly increased. The burden added by an expanding telephone system, with its increased use of the streets for that purpose, and with the accompanying inconvenience caused by almost continual installations, improvements and the moving of permanent equipment, would seem to have increased rather than lessened the extent and degree of local concern involved.

There is a natural distinction between the ordinary use of streets by the public for travel and other purposes, and the exclusive and more or less permanent use of portions of streets for the purposes here in question by individuals or corporations. This distinction has long been recognized. In speaking of the latter use by a telegraph company the court said, in *City of St. Louis* v. *Western Union Tel. Co.*, 148 U.S. 92 [13 S.Ct. 485, 37 L.Ed. 380] : ". . . this use is an absolute, permanent, and exclusive appropriation of that space in the streets which is occupied by the telegraph poles. To that extent it is a use different in kind and extent from that enjoyed by the general public." This distinction has been recognized in many cases in this state, the use for travel being referred to as the primary use and the more exclusive use being referred to as the secondary use. Not only is this distinction an entirely logical one but it is one which may be applied also to franchises granting rights which involve and affect these separate and distinct uses. That a distinction exists between a primary franchise granting a right to control a business affected with a public interest, and a secondary franchise, giving a right to occupy definite portions of certain streets, has long been recognized. (*Richmond* v. *Southern Bell Tel. & Tel. Co.*, 174 U.S. 761 [19 S.Ct. 778, 43 L.Ed. 1162] ; *Western Union Tel. Co.* v. *Hopkins*, 160 Cal. 106 [116 P. 557].) The fact that a primary franchise for telephone service is a

matter of state concern does not necessarily prevent the matter of granting a secondary franchise, giving the right to a particular and exclusive use of streets, from being a municipal affair. Logically, the matter of permitting installations which permanently occupy portions of streets would seem to be primarily a municipal affair, and control thereof should naturally rest with the same authority to which the matter of improving and maintaining streets, and controlling obstructions therein, is delegated. There is nothing inconsistent between the existence at the same time of a state franchise covering the primary use of streets for travel, together with state regulation of the general business operated, and the requirement of a franchise from the city covering the secondary and more special use of the streets, provided only that the necessary authority has been delegated by the state to the city. In speaking of a state franchise authorizing the business of furnishing electricity, and the requirement for a certificate under the provisions of the Public Utilities Act, the court said, in *Oro Electric Corp.* v. *Railroad Com.*, 169 Cal. 466 [147 P. 118]: "This is an entirely different question from that of the local control of the streets, and power over the two subjects may well be vested at the same time in different governmental bodies, without the one in any way clashing with or interfering with the other." This view has been recognized both in the statutes and in the court decisions in this state. Where the subject matter has involved the primary use of the streets, or matters affecting the general conduct of the business, a state interest and control has been increasingly recognized. On the other hand, where the subject matter involved the secondary and individual use of the streets local control has been recognized, unless the right of such control was non-existent at the time section 536, as amended in 1905, became effective.

In *Sunset Tel. & Tel. Co.* v. *Pasadena*, 161 Cal. 265 [118 P. 796], it was definitely held that the use of city streets, with which we are here concerned, was a municipal affair within the meaning of section 6 of article XI of our Constitution, as amended in 1896, and that the provisions of the city charter were therefore controlling over a claim of right arising from and based upon section 536 of the Civil Code, as amended in 1905. The distinction between the primary and secondary uses of streets, above referred to, was pointed out in that deci-

sion and it was also pointed out that from the very nature of its business a telephone company necessarily requires the exclusive use of a much larger portion of a city's streets and public places than does a telegraph company and thus encumbers them "with a network of wires, poles and fixtures to a much greater extent than a telegraph system would do."

The defendant contends that while this Pasadena case has never been directly overruled it has been "outmoded" and departed from in principle by later cases. It is argued that the Pasadena case was based upon the *pro tanto* theory that the offer made by section 536 was accepted piecemeal, as the telephone company actually used certain streets; that this *pro tanto* theory was abandoned shortly after the decision in the Pasadena case and following the opinion in the case of *Russell* v. *Sebastian*, 233 U.S. 195 [34 S.Ct. 517, 58 L.Ed. 912] ; and that, in effect, the holding in the Pasadena case has been wiped out by later decisions.

The Pasadena case was not based upon the *pro tanto* theory suggested but was based upon the fact that the requisite control over its streets had been delegated to a charter city at the time when the state's offer to telephone companies was first made through the 1905 amendment to section 536. It does not appear that this basic principle of the Pasadena case has ever been abandoned or changed. The cases relied on by the defendant have not had this effect. In *Ex parte Daniels*, 183 Cal. 636 [192 P. 442, 21 A.L.R. 1172], it was held that the regulation of traffic is not one of those municipal affairs in which chartered cities are given a power superior to that of the state Legislature by section 6 of article XI of the Constitution. That principle has been followed in many cases and is thoroughly established, but it relates to the general control of traffic, the primary use of streets, and not to the secondary or more exclusive use of portions of city streets which is here involved. There is no intimation in that case or in the cases following it that the sort of use with which we are here concerned is not a municipal affair. In other cases, notably in *City of Beverly Hills* v. *Los Angeles*, 175 Cal. 311 [165 P. 924], it has been held that a city had no right to interfere with a franchise granted by the state; but this has been done upon the express ground that a state's offer of a franchise had been accepted before the city claiming the right was authorized to act in that regard.

The Pasadena case (161 Cal. 265) was cited in *City of San Diego* v. *Kerckhoff*, 49 Cal.App. 473 [193 P. 801] ; *Bank* v.

*Bell,* 62 Cal.App. 320 [217 P. 538] ; *City of Oakland* v. *Hogan,* 41 Cal.App.2d 333 [106 P.2d 987] ; and *State of California* v. *Marin Mun. W. Dist.,* 17 Cal.2d 699 [111 P.2d 651]. More nearly in point with the case now before us it was cited with approval in *Sincerney* v. *City of Los Angeles,* 53 Cal.App. 440 [200 P. 380] and followed in *City of Salinas* v. *Pacific Tel. & Tel. Co.,* 72 Cal.App.2d 494 [164 P.2d 905]. *In County of Los Angeles* v. *Southern Cal. Tel. Co.,* 32 Cal.2d 378 [196 P.2d 773], while passing upon the purpose and effect of the 1905 amendment to section 536, the court expressly referred to this Pasadena case and to the city of Salinas case as holding that this 1905 amendment did not grant a franchise to use the streets of a city which had previously been given full control of its streets under a freeholders' charter.

We conclude that, both logically and by decision, the matter in question should and must be held to be a municipal affair within the meaning of the 1896 amendment to section 6 of article XI of the Constitution. This is especially true since the question should be considered in the light of what was then considered as a municipal affair and governed by the situation which existed in 1905 when the state's offer was first made to telephone companies. (*City of Salinas* v. *Pacific Tel. & Tel. Co.,* 72 Cal.App.2d 494 [164 P.2d 905].)

The defendant further contends that even though such a use of the city streets be considered a municipal affair control over such a matter was not given to the city by the provisions of the 1889 charter; and that any such franchises issued by the city after 1905 were invalid. The powers given to the city are set forth in chapter II of article II of this charter. Section 1 of this chapter is divided into 53 subdivisions. So far as material here, these provide or read as follows :

1. Provides for general police powers, and also the power to make and enforce such other "laws and regulations as are not in conflict with general laws or this charter."

"2. To regulate and control the use of the streets, sidewalks, highways, roads, and public places for any and all purposes; to prevent encroachments upon and obstructions to the same, and require the removal of any encroachments or obstructions thereon."

"3. To regulate and control the use of the streets and sidewalks for signs, sign posts, awnings, awning posts, drinking fountains, horse troughs, urinals, all posts for the suspension of electric wires; for traffic and sale therein; for exhibiting

banners, placards, or flags in or across the same, or from houses or other buildings, and for all other purposes."

"5. To regulate the opening of street surfaces for the laying of gas or water mains, of telegraph or telephone wires; for the building and repair of sewers; for the erection of gas or electric lights, or for any other use or purpose."

"31. To fix and determine the rate of compensation to be charged and collected by any person, company, or corporation in this city for the use of telephones; . . ."

44. To open or close any street, road or highway upon making compensation to persons whose property may be taken or injured provided that "no compensation shall be allowed for damage to gas or water pipes, railway tracks, telegraph or telephone posts or wires, or other property or thing laid above, along, in, or under any street, highway, park, place, or other public property."

46. To grant authority to construct street railways upon or over any of the streets of the city, with further powers in that connection.

47. To allow any railroad company to enter the city and make its way to the water front providing that no exclusive franchise or privilege shall be granted to such railroad company, and with further provisions.

Section 3 of this chapter reads:

"Sec. 3. The Common Council shall have power to make all rules and regulations necessary to carry into execution all powers vested by this charter, or by law, in said city, or in any department or officer thereof."

Section 5 provides that no franchise for the construction of a wharf into the bay shall be granted except on certain conditions in addition to those required by general law.

Section 6 reads in part:

"Every grant of a franchise, right or privilege shall be subject to the right of the Common Council at any time thereafter to repeal, change, or modify the said grant, . . .."

Section 7 reads:

"No exclusive franchise or privilege shall be granted for laying pipes or other conduits under any of the public streets or through any public place for the use of any telegraph, telephone, or other mode of transmitting intelligence or electric or any motive power."

Section 9 provides that authority shall not be granted to construct a street railway over any of the streets of the city except upon the conditions named therein.

The controlling question here is not whether the matter of granting a franchise to a telephone company for the use of the streets was specifically mentioned in the charter, but it is whether the essential power of control over the use of the streets for such a purpose was granted to the city by the charter provisions. In our opinion, a grant of such power to the city rather clearly appears. The intent to give the city control over such a matter more or less directly appears in several of the subdivisions of section 1, above referred to. In subdivision 1 thereof, in addition to police powers the power is given to make and enforce other laws and regulations which are not in conflict with general laws or this charter. No general state law covering the matter in question then existed. In subdivision 2, the power is given to regulate and control the use of streets and public places "for any and all purposes" and to prevent encroachments upon or obstructions to the same. In subdivision 3 the power is given to regulate and control the use of the streets for a number of purposes, including "the suspension of electric wires." This would seem, reasonably, to include the wires used in a telephone system. In subdivision 5, the power is given to regulate the opening of street surfaces for the laying of telegraph or telephone wires. This is a part of the use of the streets here in question, and in view of modern developments in telephone service has come to be a very important part of such use. These provisions indicate an intention to give to the city a control of its streets which is broad enough to include the matter here in question. (*City of Owensboro* v. *Cumberland T. & T. Co.*, 230 U.S. 58 [33 S.Ct. 988, 57 L.Ed. 1389] ; *Oro Electric Corp.* v. *Railroad Com.*, 169 Cal. 466 [147 P. 118].)

In addition to the sections of the charter just referred to, other provisions strongly tend to confirm the view that it was intended to give to the city control over this use of the streets. Subdivision 31 authorizes the city to fix charges for the use of telephones. Subdivision 44, in providing for damages to private property in connection with the opening or closing of streets, provides that no compensation shall be allowed for damage to "telegraph or telephone posts or wires, or other property" along or under any street or other public property. This strongly implies that the city has a right of control in this regard, which it may freely use. Section 3 gives the power to make all rules and regulations necessary to carry into execution all powers vested in the city. Section 7 provides that no

exclusive franchise or privilege shall be granted for laying pipes or other conduits under the streets or public places ''for the use of any telegraph, telephone or other mode of transmitting intelligence or electric or any motive power.'' Aside from any other inferences to be drawn therefrom section 7 would strongly imply that a right to grant such franchises existed. (*Gibbons* v. *Ogden,* 9 Wheat. (U.S.) 1 [6 L.Ed. 23].)

The defendant argues that any right to issue a franchise covering the use of its streets by a telephone company which might otherwise be implied from the provisions of the charter is nullified and destroyed by the portion of section 6, above quoted, providing that every grant of a franchise shall be subject to repeal or modification. It is argued that a franchise must be made effective for a definite time, and that a right given subject to repeal or modification at any time is a mere permit. Regardless of any technical distinction as to the name by which any such permission is called, we are here concerned only with whether permission for such use was required and whether the city was authorized by its charter to grant such permission. It is also argued that the word ''franchise'' is not expressly used in the charter provisions although that word is used in later provisions relating to railways and railroads, and that the rule *expressio unis est exclusio alterius* must be applied. We think the provisions of this charter are sufficiently clear that we are not required by any such rule of construction to give them an interpretation contrary to that adopted by the trial court. Where the power in question is so clearly intended to be given it should not be interpreted away because some of the other provisions of the charter, relating to railroads, use the word ''franchise.'' For some 60 years all parties concerned acted upon a practical interpretation of the provisions of the charter which was in accord with the view taken by the trial court. While this fact, in itself, is not controlling it is very suggestive if the meaning of the charter provisions, in the respect here in question, is considered in any way doubtful. We are here concerned with the power which had been given to the city at the time section 536 was amended in 1905. Beyond question, the courts would have had no difficulty, prior to that time, in holding that under these charter provisions the city has been given the right and power to grant such a franchise covering this secondary use of its streets for this particular purpose, which is clearly distinguishable from the use of such streets by the general public for traffic purposes. (*City of Salinas* v. *Pacific Tel. & Tel. Co.,* 72 Cal.

App.2d 494 [164 P.2d 905].) If they were sufficient then no good reason appears why they are not still sufficient.

Finally, the defendant contends that its use of the streets cannot be considered a public nuisance, although the court so found. It appears that the defendant then had 350,000 miles of wire, 14,000 poles, 400 miles of ducts, and 60 trench miles of conduits within the city. The extensive use of the streets for this purpose is fully apparent. If, as we have held, the defendant's use of the streets for the purposes and in the manner in question is unauthorized by law it sufficiently appears that it amounts to a public nuisance. (Civ. Code, § 3479; *Hill* v. *City of Oxnard,* 46 Cal.App. 624 [189 P. 825].)

Moreover, if the defendant's use of these streets is unauthorized the city was vested with general power to require the removal of the encroachments and obstructions which constitute the essence of that use. (*Vanderhurst* v. *Tholcke,* 113 Cal. 147 [45 P. 266, 35 L.R.A. 267]; *Laura Vincent Co.* v. *City of Selma,* 43 Cal.App.2d 473 [111 P.2d 17].) In any event, the entire matter was within the broad scope of the powers vested in the court in this equity case.

Under the controlling issues, as we view them, it is unnecessary to consider other points incidentally raised by the defendant, or to consider or analyze many cases cited in support thereof or cited in support of the contention, which may be conceded, that in recent years there has been a tendency to increase the power and control of the state over many matters which were formerly considered purely local. As we view it, we are concerned here with the matter as it existed in 1905, when an offer of a telephone franchise was first made by the state through the amendment to section 536. The offer as then made did not extend to this secondary use of streets in chartered cities, which had already been given control in that regard, and no inconsistency appears as between section 536 and the charter provisions.

### PLAINTIFF'S APPEAL

With respect to the city's appeal it appears that the various annexations to the city and the one consolidation all occurred after April 24, 1916. It also appears that the defendant and its predecessors had operated a telephone system in those areas for a considerable time prior to 1916. The city's contention on its appeal is that in the proceedings which led to the franchise granted by ordinance No. 5681, the petition requested and the ordinance granted a franchise to operate a

telephone system over, under and along all of the public streets and places "now or hereafter existing" in the said city of San Diego for a period of 30 years. It is argued that in thus accepting the privileges given it under ordinance No. 5681 the defendant is presumed to have done so with the knowledge that such territory might subsequently be annexed to or consolidated with the city of San Diego, that the defendant entered into this contract with the city notwithstanding any right it might have had under section 536 as amended in 1905, insofar as these areas are concerned, that the rule of contemporaneous interpretation by the parties should be applied, and that it follows that the annexed areas may not be segregated from the rest of the city, in the respect here in question.

We are not here concerned with the effect these matters might have had upon the contract between the parties, expressed in ordinance No. 5681, had the defendant attempted to violate the terms of that contract during the 30-year period of its existence. This they did not do and the sole question on this appeal depends upon the situation as it existed in 1916 and thereafter, when the various annexations to the city were made. No charter provisions to the contrary existed when the amended section 536 took effect in the areas which were later annexed to San Diego. It is now clearly established that when a telephone company has acquired a state franchise through its acceptance of the offer made by section 536, as amended in 1905, with respect to a certain territory, it has a vested right which may not be interfered with by any local authority. (*City of Beverly Hills* v. *Los Angeles*, 175 Cal. 311 [165 P. 924]; *County of Los Angeles* v. *Southern Cal. Tel. Co.*, 32 Cal.2d 378 [196 P.2d 773].) This right would not be lost by subsequently acting, for a time, in compliance with a franchise issued by the city. (*Oakland* v. *Great Western Power Co.*, 186 Cal. 570 [200 P. 395].) It follows that this portion of the judgment must be sustained.

For the reasons given, the judgment is affirmed.

Griffin, J., and Mussell, J., concurred.

Plaintiff and appellant's petition for a rehearing was denied July 29, 1949, and petitions of both appellants for a hearing by the Supreme Court were denied September 8, 1949.