[L. A. No. 22321. In Bank. Jan. 22, 1954.]

THE CITY OF SAN DIEGO, Plaintiff and Appellant, v. SOUTHERN CALIFORNIA TELEPHONE CORPORATION (a Corporation), Defendant and Appellant.

J. F. DuPaul, City Attorney, Shelley J. Higgins, Assistant City Attorney and T. B. Cosgrove for Plaintiff and Appellant.

John A. Sutro, Francis N. Marshall, Noble K. Gregory, Pillsbury, Madison & Sutro, Oscàr Lawler, Leslie C. Tupper and Lawler, Felix & Hall for Defendant and Appellant.

Walter C. Fox, Jr., and Chickering & Gregory, as Amici Curiae on behalf of Defendant and Appellant.

TRAYNOR, J.—Plaintiff city of San Diego by Ordinance No. 5681 granted defendant Southern California Telephone Company[1] a franchise to construct, maintain, and operate

---

[1]Since entry of judgment defendant company has been merged into its parent corporation, the Pacific Telephone and Telegraph Corporation. The change of corporate identity is not material to the issues of this case.

a system of telephone poles and wires upon the public streets of the city for a period of 30 years from August 7, 1914. When the franchise expired in 1944, the company assumed that under section 536 of the Civil Code (now Pub. Util. Code, § 7901) it had the right to use the streets without a franchise, and therefore did not seek a new franchise. The city brought suit to enjoin the company from using its streets. On May 23, 1946, the superior court entered judgment declaring that the company was committing a public nuisance in using the public streets within so much of the city as was included within its boundaries on March 19, 1905, the day before section 536 was amended to apply to telephone corporations. (We refer to this area, as do the parties, as the Old City.) The judgment ordered the company within 30 days after the judgment became final to abate the nuisance and enjoined it from occupying the public streets within the Old City. The judgment provided, however, that if within 30 days after the judgment became final the company applied for a new franchise and paid for the use of the public streets in the Old City since August 7, 1944, the order to abate and the injunction would not take effect, unless and until the company failed to accept a new franchise or the city refused to grant it. Both parties appealed, and the judgment was affirmed. (*City of San Diego* v. *Southern Cal. Tel. Co.*, 92 Cal.App. 2d 793 [208 P.2d 27].) Upon the going down of the remittitur, the company, on October 4, 1949, within the time allowed, applied for a new franchise to use the public streets within the Old City.

The present controversy is over the amount that the company must pay the city for use of the public streets of the Old City between August 7, 1944, the date the franchise expired, and September 1, 1949, the first day of the calendar month preceding its application for a new franchise. The parties concede that their rights are governed by the terms of the 1946 judgment. The relevant part thereof provides that the company shall pay the city ''that sum of money determined by applying the rate at which compensation for the franchise and privilege of such use was fixed by Ordinance No. 5681 of said city to the period from and including August 8, 1944 to, but not including, the first day of the calendar month immediately preceding the filing of such application.'' Ordinance 5681 fixed such compensation at ''two per cent of the gross annual receipts of such grantee and his or its successors or assigns arising from the use, operation or possession

of said franchise.'' During the 30 years the franchise was in effect, the company computed the amount due under the ordinance by a method that, according to the city, would result in a payment of $421,435.68, if applied during the period in question.

The trial court concluded that under the provision of the 1946 judgment quoted in the preceding paragraph, the amount due was $239,337.23. Both parties appeal. The city contends that the injunction was stayed on the condition that in the interim the previous method of computation would be continued and that the city is therefore entitled to $421,-435.68. If that contention is not sustained, the city contends that $333,541.14 is nevertheless due under the 1946 judgment. The company contends that properly computed a payment of only $158,670.03 is required. It has paid that amount to the city.[2] We have concluded that the applicable decisions and principles of law sustain the company's method of computation and that the judgment appealed from must therefore be reversed.

With minor exceptions the parties are in agreement as to the facts. The controversy is over the application of the 1946 judgment to those facts. The following factual and legal background is material in passing on the respective contentions of the parties.

The company operates a state-wide and interstate communication system. For tariff purposes its service is divided into toll service and local or exchange service. Toll service permits a subscriber to call an exchange outside his local calling area, e. g., from San Diego to Los Angeles over the lines of defendant company or from San Diego to New York by use of a connecting system. A toll charge is made for each toll call. Exchange service is generally charged for at a flat or minimum monthly rate without a special charge for each call. Exchange areas are established by the Public Utilities Commission and the boundaries thereof do not necessarily follow political boundaries. Extended area service is an expanded exchange service whereby a subscriber may call several exchanges without payment of a toll charge. The San Diego extended area, which is over 40 miles long and nearly 30 miles wide, includes most of the city of San Diego,

---

[2] Accordingly, the judgment appealed from is for $80,667.20 (the difference between $239,337.23 and $158,670.03) with interest from October 4, 1949 (the date the new franchise was applied for) of $11,293.40, or a total of $91,960.60.

all of the cities of Coronado, National City, La Mesa, El Cajon, Chula Vista, and several other communities, numerous military establishments, and a large unincorporated area. Most of the Old City is within the San Diego extended area; a small part is within the Del Mar exchange, which is not within the extended area.

The company provides its service by a complicated system of facilities. There are telephone instruments and drop wires upon the subscribers' premises; a network of poles, wires, cables and conduits partly upon public streets and partly upon private rights of way, referred to as "outside plant"; central offices with the equipment that makes and unmakes connections between telephone instruments; and offices and equipment in which engineering, accounting, billing, and administrative activities are performed. Of these facilities, only a part of the outside plant occupies public streets; the remainder is on private property.

In 1905 the Legislature amended section 536 of the Civil Code (now Pub. Util. Code, § 7901) to apply to telephone corporations.[3] By that amendment the state offers to telephone corporations a franchise to construct lines along or upon any public road or highway. ▮ The franchise is accepted when such a corporation constructs its lines on the public road or highway and maintains and operates a telephone system. (*County of Los Angeles* v. *Southern Cal. Tel. Co.*, 32 Cal.2d 378, 382 [196 P.2d 773].) ▮ When a telephone corporation obtains a franchise under section 536, it need not obtain a franchise from local authorities. (*City of San Diego* v. *Southern Cal. Tel. Co.*, supra, 92 Cal.App.2d 793, 808.) At the same 1905 session the Legislature enacted the Broughton Act. (Stats. 1905, p. 777; formerly 1 Deering's Gen. Laws, Act 2720, now Pub. Util. Code, §§ 6001-6017.) This act operates in a different field from that covered by section 536. ▮ "The Broughton Act, unlike section 536, does not grant any right or privilege, nor does it purport to empower or authorize boards of supervisors to grant franchises or other privileges, but instead indicates an intent to limit and restrict the powers which may have been granted

---

[3]Section 536 was amended to read: "Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters."

under other laws by specifying the procedure which must be imposed in the granting of any franchises by subordinate legislative bodies.'' (*County of Los Angeles* v. *Southern Cal. Tel. Co., supra,* 32 Cal.2d at 383.) In the previous appeal in the present case, it was determined that section 536 did not give the company a franchise to use the public streets within the Old City and that under the city charter the company was required to obtain a franchise from the city for the use of such streets. (*City of San Diego* v. *Southern Cal. Tel. Co., supra,* 92 Cal.App.2d at 803, 805.) In 1914, when Ordinance No. 5681 was adopted, the Charter of the City of San Diego did not provide a procedure for the granting of such a franchise to telephone companies. The Broughton Act is therefore applicable. Section three of that act provides that the payment by the holder of the franchise to the county or municipality granting the franchise shall be ''two per cent (2%) of the gross annual receipts of the person, partnership or corporation to whom the franchise is awarded, arising from its use, operation or possession.'' (Now Pub. Util. Code, § 6006.) Ordinance 5681 of the city of San Diego follows the language of section three of the Broughton Act.

That section was interpreted by this court in *County of Tulare* v. *City of Dinuba* (1922), 188 Cal. 664 [206 P. 983], involving a dispute over the amount of payments to be made by an electric company to a city and a county under Broughton Act franchises. The company contended that section three was void for indefiniteness. This court held the act valid, after a careful analysis of its language and the problems involved.

The court first pointed out that ''The gross receipts of this defendant accrue from two distinct agencies. One is the generating plants or power-houses of the company, located in three separate counties; the other is the distributing system, consisting of poles and wires extending throughout the three counties, partly upon and over streets and highways and covered by various county and municipal franchises, and partly over private easements owned by the company.'' (188 Cal. at 673.) The Broughton Act, the court continued, applies only to gross receipts ''arising'' from the ''use, operation or possession of the franchise.'' The payment required ''is not a tax upon the property of the corporation, nor a license charge for the privilege of operating its business. It is a compensation for the use of the portions of the

highway covered by the franchise easement, and it is limited to such percentage of the total gross receipts as can be shown to have arisen from the use of the franchise.'' (188 Cal. at 674.) The court prescribed a two-step apportionment for determining that percentage. The first step is to determine ''what proportion of the total annual gross receipts of the public utility should be justly accredited to its distributing system over various rights of way, as distinguished from its power plants or other producing agencies.'' (188 Cal. at 681.) This apportionment ''will establish the fund from which the percentage of earnings 'arising from the use, operation or possession' of the various franchise easements shall be ascertained.'' (188 Cal. at 681.) The second step is to apportion the receipts attributable to the distributing system between the public and private parts thereof. The court rejected the contention that this apportionment should be based on the amount of revenues collected within each county or municipality (188 Cal. at 678-679), and concluded that ordinarily an allocation on a mileage basis would be preferable, ''not necessarily as an exclusive method of distribution of the gross receipts, but as a practicable one where the contribution of the various franchise easements to the gross earnings cannot be otherwise determined.'' (188 Cal. at 681.)

The Tulare case was followed in *Monrovia* v. *Southern Counties Gas Co.*, 111 Cal.App. 659 [296 P. 117], and *Ocean Park Pier Amusement Corp.* v. *Santa Monica*, 40 Cal.App.2d 76 [104 P.2d 668, 879]. In the Monrovia case the utility had paid to the various counties and municipalities for Broughton Act franchises an amount estimated on the basis of the total mileage in each county or municipality, eliminating that part of the utility's earnings attributable to the use of its properties located on private property. The city of Monrovia, however, did not accept this allocation and contended that it should be paid 2 per cent of the gross receipts from the sale of gas within its boundaries. The trial court adopted the city's theory. The appellate court reversed, on the ground that under the Tulare case an apportionment should be made between receipts attributable to the use of the franchise and receipts attributable to other property of the utility. Similarly, in the Ocean Park case a wharf franchise followed the wording of the Broughton Act. Part of the wharf was on private land and part on city property. The court reversed a judgment awarding the city 2 per cent of the total receipts from the pier, holding that under the Tulare case the city could

not collect for the occupancy of property not owned by the city.

At the outset, the city contends that interpretation of the 1946 judgment does not turn on application of the Broughton Act or Ordinance No. 5681 to the facts of this case. It contends that the trial court stayed execution of the 1946 judgment on the condition that the status quo be maintained pending outcome of the appeal and that the status quo to be maintained was "the last actual peaceable, uncontested status which preceded the pending controversy," namely, the status that existed for 30 years preceding August 8, 1944. Under any other interpretation, the argument continues, the stay would have been beyond the power of the trial court. The city then contends that maintenance of the status quo compelled continued application of the method of accounting used by the company between 1914 and 1944 under the expired franchise, and that the amount due by that method is $421,435.68.

The trial court, however, did not issue an injunction and thereafter stay its effect pending appeal. Instead, it provided that the injunction would not take effect until 30 days after the judgment became final. Until that time, there was nothing to be stayed. Even after the 30-day period, the injunction took effect only if the company had failed within that period to apply for a new franchise and pay for use of the public streets during the interim period, or if it subsequently failed to accept a new franchise or the city refused to grant it.

■ Since the judgment was affirmed on the previous appeal, the city is foreclosed from challenging the conditions attached to issuance of the injunction. It bears noting, however, that a conditional injunction was appropriate to this litigation. It is true that after the former franchise expired the company no longer had permission from the city to use the streets. (*Cf. Village of Lapwai* v. *Alligier*, 69 Idaho 397, 402 [207 P.2d 1025].) It is also true that the trial court did not have the power to grant the company a new franchise; it was the responsibility of the city, under its charter, to determine whether the company should receive a new franchise. (*Sunset Tel. & Tel. Co.* v. *Pasadena*, 161 Cal. 265, 285 [118 P. 796].) Nevertheless, the question to be determined in the previous trial and appeal was whether the company needed a new franchise. The company conducted that litigation in good faith and was partly successful. Aside from the rights of

the company, it was clearly in the public interest that the trial court withhold issuance of an injunction and thus assure continued telephone service pending outcome of the appeal. (See *State* v. *Missouri Standard Tel. Co.*, 337 Mo. 642, 656 [85 S.W.2d 613].) Accordingly, the trial court in the exercise of its discretion as a court of equity could delay the taking effect of its injunction and allow the company to use the streets until it was finally determined whether it was required to obtain a franchise. The requirement that the company continue to pay the amount due under its prior obligation adequately protected the city in the interim.

Moreover, even if the action of the trial court were viewed as a stay of an injunction that had previously issued, the terms of the judgment do not support the city's contention. The judgment provided that the company should pay "that sum of money determined by applying the rate at which compensation for the franchise and privilege of such use was fixed by Ordinance No. 5681 of said City." It did not provide that payment should be computed according to the previous practice of the company; it called for payment according to the company's actual obligation as fixed by the terms of the expired franchise. The terms of the judgment are therefore controlling, whether or not the company misconceived its obligation under the ordinance during the years the franchise was in effect. The judgment did not give either the city or the company more or less rights in the interim than either had had under the expired franchise.

The city contends that the trial court did not have power to stay its injunction unless it required the company to continue to use the same method of accounting that had been used in computing payments under the expired franchise. A trial court is not so limited. It may protect the parties on appeal by providing that its injunction or order is stayed, under conditions that protect the appellant by preserving the subject matter of the appeal pending outcome thereof and at the same time protect the respondent by saving to it the benefits of the judgment in the event of an affirmance. (*Tulare Irr. Dist.* v. *Superior Court*, 197 Cal. 649, 669 [242 P. 725]; see, also, *City of Pasadena* v. *Superior Court*, 157 Cal. 781, 795 [109 P. 620, 21 Ann.Cas. 1355].) The terms of the expired franchise were an adequate standard for determination of the amount that the company should pay the city.

The determinative question on this appeal is thus the cor-

rect interpretation of the ordinance. The ordinance fixed the amount that the company should pay the city at 2 per cent of the gross receipts "arising from the use" of the franchise, following the language of section three of the Broughton Act. The controlling question is, what part of the company's gross receipts should be taken as arising from the use of the franchise, i.e., from the use of the public streets within the Old City? To answer this question we must (1) determine how the company's gross receipts are to be ascertained; (2) apportion those receipts between the company's producing plant, which is entirely on private property, and its distributing system, which is partly on private property and partly on public property; and (3) apportion the receipts attributable to the distributing system between private and public rights of way.[4]

(1) Gross receipts of the company from its telephone operations arise from two sources: its exchange service and its intrastate[5] toll charges. We will first consider the problem of determining the amount of gross receipts from exchange service. The amount collected from the extended area during the period in question was $27,724,579.76, and from the Del Mar exchange $116,896.63. The amount collected from stations and equipment within the Old City from the two local calling areas was $18,701,456. The trial court and the company agree that the total receipts from the exchange area must be apportioned between the Old City and the remainder of the local calling area; they differ, however, on the method of allocation to be used. The trial court made its apportionment by using the ratio of the mileage of the distributing system on public streets in the extended area to the mileage on public property on the Old City part thereof. The company used the ratio of the amount invested in plant within the two areas. The city, using the same method as did the company during the term of the expired franchise, contends that an apportionment of the entire receipts from the local calling area is unnecessary, and that the amount of gross receipts upon which to apply the Broughton Act is the amount actually collected within the franchise area, the Old City.

[4]The data used in the following discussion are from the company records, kept pursuant to a uniform system of accounting prescribed by the California Public Utilities Commission, the Federal Communications Commission, and regulatory bodies of the several states.

[5]The Broughton Act does not apply to interstate business of the company. (Broughton Act, § 1; now Pub. Util. Code, § 6001.)

 We have concluded that the city's contention cannot be sustained. Receipts from exchange service represent a charge to the subscriber for use of all the company's property within the local area, since for a flat monthly charge he can call any subscriber therein. The amount collected by the company from any particular subscriber is not attributable solely to that subscriber's telephone; it is attributable to all of the equipment within the calling area. Receipts collected within the Old City are partly earned by the company's facilities in the remainder of the calling area and the converse is equally true.

It is therefore necessary to determine the Old City's share of the total amounts received from exchange service. If conditions throughout the area were uniform, an apportionment on the basis of mileage would be satisfactory. In the present case, however, an apportionment based on relative investment more appropriately measures the gross receipts attributable to the various parts of the local calling area, for there is more outside plant per mile of right of way in the heavily congested urban area comprising the Old City. It is reasonable to assume that the franchise area contributes more to the production of revenue per mile of right-of-way than does the more remote nonfranchise area.

 The next problem is to determine the amount of intrastate toll revenue attributable to the Old City. The trial court did not take toll revenues into account. The company, however, uses the public streets of the Old City in earning its revenue from toll calls and some of that revenue thus necessarily arises "from the use, operation or possession" of the franchise and comes within the Broughton Act. The city, following the method used by the company during the expired franchise, computes the amount of toll revenue attributable to gross receipts by ascertaining the amount of toll revenue originating within the Old City and allocating 20 per cent thereof to the Old City. No explanation is made to justify the use of the figure of 20 per cent. The company, on the other hand, begins its computation with its total toll receipts in the state. It determines the Old City's share thereof by using the ratio of the total investment of the company in toll plant within the state to its investment in toll plant within the Old City.

Clearly, it would be impossible to compute with complete accuracy the Old City's share of each of the thousands of toll calls originating or terminating therein, for a separate calcu-

lation would have to be made for each call. An approximation must be made and, in our opinion, the company's method is practicable and allocates to the Old City its fair share of toll receipts.

(2) The next step in determining the amount of gross receipts arising from the use of the franchise is to apportion the gross receipts arising within the Old City between the company's producing plant and its distributing system. The city does not make this apportionment in its computation. █ As pointed out in the Tulare case, however, in applying the Broughton Act it is necessary to determine "what proportion of the total annual gross receipts of the public utility should be justly accredited to its distributing system over various rights of way, as distinguished from its power plants or other producing agencies." (*County of Tulare* v. *City of Dinuba, supra,* 188 Cal. 664, 681.)

The city contends that the Tulare case is not applicable here, on the ground that it involved an electric company that manufactured its product in one locality and distributed it in another, and that both factors contribute to the total gross receipts, whereas the receipts of a telephone company arise solely from its communication service and no revenues could be obtained without use of the city streets. The proposed distinction is untenable. A person buys electric service just as he buys telephone service. In the one case electric power supplies heat, light, and energy; in the other, spoken words are converted into electric impulses and back again to spoken words. The powerhouse of an electric company and the central plant of a telephone company are essential to the operations of each; neither would have any gross receipts if it had only its central plant and no other means of reaching its customers than by use of the public streets.

It is therefore apparent that the apportionment between the distributing system and the remainder of the company's plant must be made in the present case unless we overrule the Tulare case and disapprove the Ocean Park and Monrovia cases. We have reexamined those cases and have concluded that they were correctly decided.

█ The payment required under the Broughton Act is based on the gross receipts of the utility "arising from its use, operation or possession" of the franchise. It is a familiar concept in public utility legislation and regulation that the gross receipts of a utility arise from all of its operative property and not exclusively from any one part thereof. (See

*Southern Cal. Tel. Co.* v. *Los Angeles County,* 212 Cal. 121, 129 [298 P. 9]; *Third & Broadway Bldg. Co.* v. *Los Angeles County,* 220 Cal. 660, 663 [32 P.2d 377]; *New Jersey Bell Tel. Co.* v. *State Board of Taxes & Assessment,* 280 U.S. 338, 348-349 [50 S.Ct. 111, 74 L.Ed. 463].) Thus, in the present case the franchise, in common with all other operative property of the company, contributes to its total gross receipts.

The words of the Broughton Act, referring to receipts arising from use of the franchise rather than to receipts arising from the use of all of the property, indicate that an apportionment was to be made. The city would compute the amount due under the act as if it read, "the grantee shall pay the proportion of two per cent of its *entire* gross receipts attributable to the franchise area which the number of miles covered by the franchise granted bears to the total number of miles in the franchise area." The act does not admit of that construction.

It is necessary, therefore, to determine how to apportion gross receipts between the distributing system and the other operative property of the company. In our opinion, a reasonable method is to allocate gross receipts by the ratio that the company's investment in its distributing system in the area bears to its total investment in plant therein. Each category of the company's property contributes to its total gross receipts. As in rate making, it is reasonable to assume that there is a relationship between the value of the property and the amount that it earns. Moreover, no other method of apportionment is feasible, since invested value is the only common factor between the distributing system and the other operative property that fairly reflects the relative contribution of each category of property to the company's earnings. The city contends that an allocation could be made on a linear basis but, obviously, that method is not feasible, for powerhouses, office buildings, and the like cannot be measured by the mile.

(3) The final step in determining the amount of gross receipts arising from the company's use of the public streets within the Old City is to apportion the gross receipts attributable to the distributing system between the parts thereof on public and private rights of way.

In the Tulare case, the court stated that ordinarily the apportionment should be made according to the ratio that the mileage of the distributing system on public rights of way bore to the entire mileage of the distributing system

within the area. The court pointed out, however, that "There may be instances where the extent or value of the distributing system over a given right of way may indicate its earning capacity. . . . In such cases these conditions should be taken into account." (*County of Tulare* v. *City of Dinuba, supra,* 188 Cal. 664, 682.) An apportionment based on relative investment in the various parts of the distributing system was upheld on a subsequent appeal in the Tulare litigation. (*County of Tulare* v. *City of Dinuba,* 87 Cal.App. 744, 748 [263 P. 249].)

As previously pointed out, in apportioning gross receipts between the Old City and the remainder of the extended area and the Del Mar exchange, a ratio based on relative investment should be used, so that the Old City will be allocated its fair share of gross receipts. As between different parts of the distributing system within the Old City, a ratio based on relative investment would likewise fairly apportion receipts between public and private rights of way.

In the light of the foregoing discussion, we consider the interpretation of the 1946 judgment by the city, the trial court, and the company.

 *The city's method of computation:* The city contends that if the amount due under the 1946 judgment is to be governed by the ordinance, the company owes it $33,541.14. The city arrives at that figure as follows: The total mileage of the distributing system in the Old City is 562.44 miles, of which 446.297 miles, or 79.35 per cent, is on public property. The gross receipts of the company collected from stations and equipment within the Old City are $21,017,085.16. Those receipts are apportioned between public and private parts of the distributing system by allocating to the former 79.35 per cent of the gross receipts, or $16,677,057.07. Two per cent of that amount is $333,541.14.

The city arrives at $21,017,085.16 as the company's gross receipts by taking the exchange service receipts actually collected by the company from stations and equipment within the Old City and adding thereto 20 per cent of toll service receipts from calls originating within the Old City. As previously pointed out, gross receipts cannot be computed in this manner. The city's method is also erroneous in that it attributes all of the receipts to the distributing system and does not allocate any receipts to the use of the company's other property. Finally, the city has erred in apportioning

receipts between the public and private parts of the company's distributing system by use of a mileage ratio instead of a relative investment ratio.

■ ■ *The trial court's method of computation:* The trial court concluded that the amount due under the 1946 judgment was $239,337.23. It arrived at that figure as follows: The mileage of the distributing system on public streets in the San Diego extended area is 1,026.214[6] miles, of which 442.882[7] miles, or 43.15 per cent, is on public property in the Old City. The gross receipts of the company in the extended area during the period in question were $27,724,-579.76. Of that amount 43.15 per cent, or $11,963,156.17, is apportioned to use of the public streets in the franchise area. Two per cent of that amount is $239,263.12. The same formula applied to that part of the Old City within the Del Mar exchange gives $74.11, which added to the preceding figure makes a total of $239,337.23. The trial court did not take toll receipts into account.

The trial court thus made the same error as did the city in failing to allocate any of the company's receipts to its powerhouses, office buildings, and other property not subject to any franchise charge. The trial court disregarded toll calls, although the company used the public streets in obtaining toll revenue. ■ The trial court used a mileage ratio in making its apportionment between total receipts in the extended area and the receipts attributable to the Old City, although, as we have seen, a ratio based on relative investment is appropriate to the present case. ■ Finally, the trial court did not take into account the fact that part of the company's distribution system is on private rights of way. Had it done so, its ratio would have been the ratio of outside plant on public streets in the Old City, 442.882 miles, to outside plant on public and private rights of way in the extended area, 1,409.573 miles, or 31.42 per cent.

■ ■ ■ *The company's method of computation:* The company contends that the amount due under the 1946 judgment is $158,670.03. It arrives at that figure as follows: The total investment in plant in the San Diego extended area

---

[6]According to the company, the correct figure is 1,029.314 miles. If that mileage were used, the amount due under the trial court's method would be $238,672.08.

[7]The city's figure of 446.297 miles in the Old City is the total of 442.882 miles in the extended area, 0.795 miles in the Del Mar exchange, and 2.62 miles attributed to toll plant.

(excluding the part allocated to toll use) is $26,916,709, of which $5,238,777, or 19.46 per cent, is invested in outside plant on public streets in the Old City. For a sample period, January 1 to August 31, 1949, the gross receipts from the extended area were $5,076,394.89. Of that amount, 19.46 per cent is $987,866.45, the amount of gross receipts attributable to the use of the streets in the Old City. The same formula applied to the Del Mar exchange gives $57.78. The company applies the same method to toll receipts from the entire state, which results in $177,973.65 attributable to the Old City. The total gross receipts from the three sources of gross receipts attributable to the use of streets in the Old City is $1,165,897.88. Two per cent of that amount is $23,317.96, the amount due for 1949. Applying the same method to the other years results in the company's total of $158,670.03.

Under the views expressed in this opinion, the company applied correct legal principles in its computation. It used a ratio based on relative investment in each of the three steps necessary to determine the amount of gross receipts arising from use of the public streets within the Old City: (1) ascertaining the Old City's share of receipts for local service within the extended area and the Del Mar exchange, and of intrastate toll charges; (2) ascertaining the distributing system's share of the amount attributable to the Old City; and (3) ascertaining the franchise's share of the amount attributable to the distributing system.

The company has requested that this court direct the trial court to enter judgment in its favor. Some of the data used by the company in arriving at its computation, however, have not been found to be true by the trial court. We have used these data in this opinion to illustrate application of the legal principles herein discussed but, of course, we cannot deny the city an opportunity to challenge the accuracy and completeness of the company's figures in the trial court.

The judgment is reversed for further proceedings in conformity with the views expressed in this opinion. The city shall bear the costs of this appeal.

Gibson, C. J., Shenk, J., Edmonds, J., Schauer, J., and Spence, J., concurred.

CARTER, J., Concurring and Dissenting.—I concur in the judgment of reversal, but do not agree with the reasoning

advanced by the majority, nor do I feel that a judgment should be rendered in conformity with such views.

It is my considered opinion that the majority view is a departure from the rule established in the Dinuba case (*County of Tulare* v. *City of Dinuba,* 188 Cal. 664 [206 P. 983]), in that it seeks to employ the capital investment method of apportionment beyond its limitations.

The same general principles which I enunciated in my dissent in the Southern Counties Gas case (*County of Los Angeles* v. *Southern Counties Gas Co., post,* p. 129 [266 P.2d 27]) should be applicable to the instant case, since in both cases the municipality granting the franchise is entitled to 2 per cent of the gross annual receipts arising from the "use, operation, or possession" of the franchise. There are, however, a few problems in regard to telephone revenues which are not present in cases involving gas and electric companies. One such problem has to do with the apportionment of toll receipts. It is true that part of the tolls collected in an area are for communication services rendered in other areas, where the message is transmitted and received; however, inasmuch as messages are also sent into and received in the local area without any revenues being collected there it would seem that the factors would balance each other out. Thus, by attributing all local tolls collected in an area to the gross receipts of that area, we are giving credit for some services rendered elsewhere; but this is counterbalanced by the fact that an equal proportion of toll calls are probably transmitted or received by the local area without any increase to its gross receipts.

In the case at bar the gross receipts (including toll receipts) collected by the telephone company within the extended area should be used as the starting point in our formula. These gross receipts should be apportioned between the distribution system and other systems (such as production facilities) so as to ascertain the proportion of gross receipts attributable to the entire distribution system. These gross receipts of the entire distribution system should then be apportioned between the public and private franchises on a mileage basis. Since 43.15 per cent of the mileage in the extended area is on public property within the Old City, 43.15 per cent of the entire distribution receipts should be allocated to the fund from which the 2 per cent is to be taken.

For these reasons, and those given in my dissent in the Southern Counties Gas case, *post,* p. 129 [266 P.2d 27],

I feel it would be a grave error to follow the formula established by the majority. Such a formula is not consistent with the Dinuba case nor with the best interests of the general public.

Plaintiff and appellant's petition for a rehearing was denied February 17, 1954. Carter, J., was of the opinion that the petition should be granted.