[No. C000031. Third Dist. July 1, 1987.]

COUNTY OF SACRAMENTO, Plaintiff and Appellant, v. PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Appellant.

**COUNSEL**

L. B. Elam, County Counsel, and Monte L. Fuller, Deputy County Counsel, for Plaintiff and Appellant.

Robert Ohlbach, Joseph I. Kelly, Patrick G. Golden, Craig M. Buchsbaum, Howard V. Golub, LeBoeuf, Lamb, Leiby & MacRae, John N. Frye for Defendant and Appellant.

C. Edward Gibson, Mary J. Wood, Vincent P. Master, Jr, Janice E. Kerr, Hector Anninos and Suzanne Engelberg, as Amici Curiae on behalf of Defendant and Appellant.

**OPINION**

**SPARKS, J.**—Under the Broughton Act (Pub. Util. Code, § 6001 et seq.), a county may grant a franchise to the highest bidder to use its public streets to transmit and distribute gas and electricity. The grantee is statutorily required to pay the county a fee of 2 percent of the "gross annual receipts" derived from the use of the franchise. (Pub. Util. Code., § 6006.) The County of Sacramento (County) granted two such franchises to defendant Pacific Gas and Electric Company (PGandE) to use county streets to supply gas and electricity to the public. PGandE regularly uses its franchise facilities to convey and sell gas and electricity to its customers in Sacramento County and pays the franchise fee to the County on the revenues generated by those sales. In addition to its customers, PGandE also uses the franchise facilities to transmit and distribute gas and electricity to itself for its own internal use. It does not pay itself for that power and consequently did not remit any franchise fee to the County for the use of the franchise for those internal transmissions. The County claims that it is entitled to franchise fees for those transmissions. Predictably, the principal issue in this case is whether, for purposes of calculating the franchise fee, PGandE must add to its gross

receipts the value of gas and electricity which it uses internally but does not sell. Our review of the Broughton Act convinces us that the franchise fee was intended to be payable only when revenue is actually received by the franchisee. Since PGandE did not receive any "gross annual receipts" arising from the use of the franchise facilities for its own internal use, it had no obligation to pay the County any fee for that use.

This case began when the County filed a complaint against PGandE for the recovery of franchise fees for the years 1973-1979 for amounts due on what the County described as "interdepartmental sales". It also sought a declaratory judgment determining the meaning, construction and validity of the terms of the franchises and the respective rights and obligations of the parties under them. The trial court ruled that PGandE improperly excluded the value of gas and electricity it consumed or used internally from its gross receipts. It further ruled that investments made by PGandE upon public utility easements granted by parties other than the County did not constitute investments on franchise property for purpose of calculating the fee. Both parties appeal. PGandE contends that the trial court erred in determining that a sum should be included in its gross annual receipts for gas and electricity which is used internally and not sold to the public. The County contends that the trial court erred in concluding that PGandE's use of public utility easements is not a use of franchise property. Because we agree with PGandE's contention and reject the County's, we shall reverse part of the judgment and affirm the remainder.

### THE BROUGHTON ACT

■ ■ ■ ■ By the Broughton Act, the Legislature empowered local governments to grant franchises for the use of public streets and highways for public utility purposes.[1] "Every franchise . . . . to lay gas pipes for the purpose of carrying gas for light, heat, or power, to erect poles or wires for transmitting electricity for light, heat, or power, along or upon any public street or highway, or to exercise any other privilege whatever proposed to be granted by the governing or legislative body of any county, city and county, or city shall be granted upon the conditions in this article provided, and not otherwise . . . ." (Pub. Util. Code, § 6001.)[2] All franchises must be

---

[1] The power to grant franchises to use public streets and highways in a manner different than the public in general is ordinarily vested in the state legislature. (12 McQuillin, Municipal Corporations (3d rev. ed. 1986) §§ 34.13-34.14, pp. 49-57.) However, the legislature may delegate such authority to local governments. (*Ibid.*) Our Legislature has done so in the Broughton Act, provided that the franchises granted by the local governments conform to the requirements of the statute. (Pub. Util. Code, § 6001.)

[2] Public Utilities Code section 6001 reads in its entirety: "Every franchise or privilege to erect or lay telegraph or telephone wires, to construct or operate street or interurban railroads upon any public street or highway, to lay gas pipes for the purpose of carrying gas for

granted upon an unrestricted "free and open competition" basis, after published advertisements and sealed bids, to the highest cash bidder. (Pub. Util. Code, §§ 6003-6005.) ■ Although the acceptance of a franchise is a matter of contract, the offer of such a contract is on a take-it-or-leave-it basis; a franchisee may only accept a franchise on the terms dictated by the Legislature. "It is purely a matter of contract. While it is true that the payment is required by law as a condition of the franchise grant, it is a matter of option with the applicant whether he will accept the franchise on those terms. His obligation to pay is not imposed by law but by his acceptance of the franchise." (*County of Tulare* v. *City of Dinuba* (1922) 188 Cal. 664, 670 [206 P. 983].) But the amount to be paid is fixed by statute and it is that statutory provision which gives rise to this lawsuit. The statute provides that the grantee "shall during the life of the franchise pay to the county or municipality two percent (2%) of the gross annual receipts of the grantee arising from the use, operation, or possession of the franchise." (Pub. Util. Code, § 6006.)

In 1948, in ordinance No. 341, the County granted to PGandE a franchise to place gas pipes, mains and appurtenances in public streets and highways for the purpose of supplying gas to the public. Also in 1948, in ordinance number 342, the County granted PGandE a franchise to place electric lines, poles, conduits and other structures upon the public streets for the purpose of supplying electricity to the public.[3]

The fee provisions of the Broughton Act were considered by the Supreme Court in *County of Tulare* v. *City of Dinuba, supra,* 188 Cal. 664. In that case the utility operated under franchises granted by different municipalities, and the dispute was the manner in which the different municipalities should be compensated. The Supreme Court gave the Act a practical interpretation in order to uphold it against the claim of uncertainty. (*Id.,* at p. 675.) The court rejected the idea that the fees payable to a municipality were to be based solely upon receipts collected within the municipality. (*Id.,*

---

light, heat, or power, to erect poles or wires for transmitting electricity for light, heat, or power, along or upon any public street or highway, or to exercise any other privilege whatever proposed to be granted by the governing or legislative body of any county, city and county, or city shall be granted upon the conditions in this article provided, and not otherwise, except when such franchises are granted pursuant to Chapters 2 or 3 of this division. [¶] This article does not apply to franchises or privileges for railroads, or telegraph or telephone lines doing an interstate business, or to renewals of franchises for piers, chutes, or wharves, or to community antenna television systems, or to franchises or privileges for purposes not involving the furnishing of any service or commodity to the public or any portion thereof."

[3] The PGandE franchises were granted pursuant to the original Broughton Act, which was an uncodified act enacted in 1905. (Stats. 1905, ch. 578, pp. 777-780.) The franchise fee provisions were contained in section 3 of the original act. (*Id.,* at pp. 777-778.) The first sentence of section 3 of the original act, with only inconsequential changes, became section 6006 of the Public Utilities Code in 1951 when that code was adopted.

at p. 674.) Instead, the utility should be treated as a single entity and its gross receipts attributable to franchises in all of the municipalities should be apportioned according to mileage. (*Id.,* at pp. 676-678.) In this calculation the utility's gross receipts are to be apportioned between those arising from distribution systems and those arising from operation of power plants and other producing agencies. (*Id.*, at p. 681.) From the distribution receipts are excluded those attributable to the use of private rights of way, leaving only those receipts attributable to the use of franchise properties. (*Ibid.*) This sum was then to be divided among the municipalities on the basis of mileage within each municipality. (*Ibid.*) The court recognized that this method of apportionment was not the exclusive method. In some circumstances it may be possible to differentiate more accurately between receipts arising from different parts of the system. In the absence of such factors, however, the division should be based upon mileage. (*Id.,* at pp. 681-682.)[4]

In *County of L. A.* v. *Southern etc. Gas Co.* (1954) 42 Cal.2d 129 [266 P.2d 27], the Supreme Court again considered the fee provisions of the Broughton Act. In that case the utility had based its calculations upon certain principles which the Supreme Court agreed were consistent with the opinion in the *Tulare* case. These principles are: (1) A utility's gross receipts arise from all of its operative property, wherever located. (2) Operative property consists of various kinds of real and personal property of which pipe lines and appurtenances on public and private rights of way are but a component part. (3) Since the 2 percent charge applies only to receipts arising from the use of franchises, gross receipts arising from other operative property must be excluded from the base to which the charge applies. (4) Since every dollar invested in operative property earns an equal part of the gross receipts an apportionment of the gross receipts according to dollars invested in various types of property is fair, practical, readily understood and easily verified. (5) Gross receipts that arise from the use of franchises are the gross receipts attributable to that part of the property using the rights of way pursuant to the franchises. (6) Gross receipts attributable to the various rights of way may be apportioned between public and private rights of way on the basis of investment, but otherwise should be apportioned according to mileage. (42 Cal.2d at pp. 133-134.)

As we have recounted, this action was instituted by the County to recover amounts allegedly owed by PGandE for the years 1973 through 1979. Originally the County disputed PGandE's calculations in numerous re-

---

[4] On remand the lower court divided the portion of the franchise fees due to the County of Tulare and the City of Dinuba on the basis of relative investment in the distributing systems in each area. This division was affirmed on appeal. (*County of Tulare* v. *Dinuba* (1927) 87 Cal.App. 744, 748 [263 P. 249].) It has since been approved by the Supreme Court. (*City of San Diego* v. *Southern etc. Tel. Corp.* (1954) 42 Cal.2d 110, 125 [266 P.2d 14].)

spects. However, some of these matters were resolved through agreement by the parties, and others were resolved by the trial court and are not at issue here. In its appeal PGandE disputes the trial court's treatment of so-called interdepartmental sales and intradepartmental use of gas and electricity. In its appeal the County contends that the trial court erred in concluding that investments on public utility easements are not to be included as investments on franchise property. As an additional issue, to be addressed only in the event PGandE fails to prevail in its appeal, PGandE contends that the County waived the right to include interdepartmental sales and intradepartmental use of gas and electricity in the calculation for the years 1973 through 1976.

## DISCUSSION

### I

The concept of interdepartmental sales and intradepartmental use of gas and electricity is easily explained. PGandE is a single company involved in multiple public utility services. Some of the gas produced or purchased by PGandE is used internally and not sold to the public, and some of the electricity produced is also used internally rather than sold. Interdepartmental sales refers to the use of electricity by the gas department and the use of gas by the electric department. Intradepartmental use refers to the use of electricity by the electric department and the use of gas by the gas department. By far the largest item in this internal usage of gas and electricity is the use of gas by the electric department to generate electricity which is sold to the public. For example, in 1973 internally used gas was valued at $116,659,976.78 for regulatory purposes. Of this amount $115,195,593.06 was used for the generation of electricity. The total internally used electricity during that year was valued at $2,353,722.12 for regulatory purposes.

We have noted that a value is assigned to internally used gas and electricity for regulatory purposes. This refers to the Public Utility Commission's (PUC) rate-making practices. For these regulatory purposes the PUC treats the electric department and the gas department as though they were separate entities. A tariff is assigned for internally used gas and electricity which is then utilized in determining the rates which may be charged for these products. This accounting system is used only for planning and ratemaking purposes. There is no transfer of funds from one department to the other, and PGandE does not actually receive any consideration for such transfers. For other accounting purposes PGandE is treated as a single entity. It was established, and is obvious, that the PUC must, out of fairness, assign a monetary value to interdepartmental transfers because to do otherwise would in effect require gas customers to subsidize electric customers.

■ In determining the franchise fees payable to the County, PGandE does not include any sum for the internal use of gas and electricity as a gross receipt. The County contends, and the trial court agreed, that this is improper. The trial court held that in determining the franchise fees payable to the County PGandE must include sums based upon the PUC tariff as gross receipts. PGandE claims that the trial court misread the clear meaning of the Broughton Act while the County retorts that this reading is consistent with the underlying purpose of the Act. We conclude that PGandE has the better argument.

In the usual fashion, counsel would have us decide the case by resort to the conflicting rules of statutory construction. PGandE advances the "plain meaning" rule and argues that the trial court's interpretation violates the plain meaning of the Broughton Act and of its franchise agreements.[5] The County urges us to disregard the literal meaning of the statutory phrase in order to fulfill the objective of the statutory scheme and because franchises must be construed in favor of the public.

■ The "plain meaning" rule was classically stated by the Supreme Court of the United States this way: "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms. [¶] Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." (*Caminetti* v. *United States* (1917) 242 U.S. 470, 485 [61 L.Ed. 442, 452-453, 37 S.Ct. 192]; citations omitted.) Like other jurisdictions, California courts routinely employ the rule. (See e.g., *People* v. *Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288]; *People* v. *Webb* (1986) 186 Cal.App.3d 401, 409 [230 Cal.Rptr. 755]; *People* v. *Wright* (1979) 92 Cal.App.3d 811, 813 [154 Cal.Rptr. 926].) It was recently applied by the California Supreme Court in *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 818 [226 Cal.Rptr 81, 718 P.2d 68], where the court declared: "If the language is clear, there can be no room for interpretation; effect must be given to the plain meaning of the words."

The plain meaning rule presupposes that statutory words and phrases are used in their common and ordinary sense. Thus, "courts should give effect

---

[5] We reject the claim that this case involves the interpretation of a contract. A Broughton Act franchise is contractual in the sense that the utility and the municipality enter into the relationship by mutual agreement. (*County of Tulare* v. *City of Dinuba, supra,* 188 Cal. at p. 670.) However, the contract is required to contain the provisions dictated by the Legislature. (*Ibid.*) The parties are no more free to alter the legislative prescribed provisions through interpretation than they would be to expressly alter them. We thus resolve the issues in this case by looking for legislative intent.

to statutes 'according to the usual, ordinary import of the language employed in framing them.' " (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; citation omitted.) ■ The first question then is what is the ordinary meaning of "gross annual receipts." In its ordinary usage as a financial term, gross means "an overall total exclusive of deductions," annual means "yearly", and receipts means "something received." (Webster's New Collegiate Dict. (1981) "Gross" p. 502, "Annual" p. 46, "Receipt" p. 956.) The phrase "gross receipts" is similarly defined in law dictionaries. Thus gross receipts refers to the total amount of money or the value of other considerations received from selling property or performing services. (See Black's Law Dict. (5th ed. 1979) "Gross receipts" p. 633; Ballentine's Law Dict. (3d ed. 1969) "gross receipts" p. 537.) In like fashion, the courts have always considered that gross receipts are measured by money or other consideration actually received by a party or paid for his benefit. (See e.g., *City of Los Angeles* v. *Clinton Merchandising Corp.* (1982) 58 Cal.2d 675, 681 [25 Cal.Rptr. 859, 375 P.2d 851]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 647 [335 P.2d 672]; *N. W. Pac. R. R.* v. *St. Bd. of Equalization* (1943) 21 Cal.2d 524, 529-531 [133 P.2d 400]; *Pacific Gas & Elec. Co.* v. *Roberts* (1917) 176 Cal. 183, 192 [167 P. 845].) Indeed, "gross receipts", a familiar and commonplace phrase of accounting and taxation, is used throughout our codes. (See e.g., Bus. & Prof. Code, § 16002.2; Gov. Code, § 37101.7; Harb. & Nav. Code, § 71.6; Rev. & Tax. Code, § 36060.) It is occasionally defined there as well. (See e.g., Rev. & Tax. Code, § 6012, subd. (a) (For purposes of sales and use taxes, " '[g]ross receipts' mean the total amount of the sale or lease or rental price, as the case may be, of the retail sales of retailers, valued in money, whether received in money or otherwise, without deduction on account of [costs and other listed items].") Because it is such a common phrase, it has been said that the term "gross receipts" has a plain meaning and is unambiguous. (*Pacific Gas & Elec. Co.* v. *Roberts, supra,* 176 Cal. at p. 192; *Pacific Greyhound Lines* v. *Johnson* (1942) 54 Cal.App.2d 297, 302 [129 P.2d 32].) Consequently, if used in its ordinary sense in the Broughton Act, the term "gross annual receipts" must be held to mean money or other valuable consideration actually received yearly by the grantee of a franchise for selling goods or services to the public. So used, it would exclude intracompany transfers of gas and electricity between departments of the same company which do not generate any outside revenues.

■ But the plain meaning rule does not compel rote application of the common meaning of words without regard to the context in which they are used. "So stated, the rule is simple nonsense; to exclude consideration of context would be to ignore one of the basic principles of communication." (Dickerson, The Interpretation and Application of Statutes (1975) How to

Read a Statute, p. 230.) What we mean by the rule is that it is clear from the context that the words are used in their ordinary sense.[6] "Consideration of the context and setting is indispensable properly to ascertain a meaning. In saying that a verbal expression is plain or unambiguous, we mean little more than that we are convinced that virtually anyone competent to understand it, and desiring fairly and impartially to ascertain its signification, would attribute to the expression in its context a meaning such as the one we derive, rather than any other; and would consider any different meaning, by comparison, strained, or far-fetched, or unusual, or unlikely. ([¶ . . . Implicit in the finding of a plain, clear meaning of an expression *in its context,* is a finding that such meaning is rational and 'makes sense' in that context." (*Hutton* v. *Phillips* (1949) 45 Del. 156, 160 [70 A.2d 15, 17], italics in original; quoted in *Dickerson, op. cit. supra,* at p. 231.)

Thus, the plain meaning rule does not oblige the court to adhere to the narrowest possible literal reading of the phrase despite the absurdity of the result or manifest proof of a contrary legislative intent. (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849, fn. 6 [59 Cal.Rptr. 609, 428 P.2d 593].) Consequently, even the meaning of a statutory phrase as ordinary as "gross receipts" may be expanded or contracted in order to fulfil the objective of the entire statutory scheme. (See *People* ex rel. *Flournoy* v. *Yellow Cab Co.* (1973) 31 Cal.App.3d 41, 45 [106 Cal.Rptr. 874].) This is simply another way of saying it is apparent from its contextual usage that the statutory phrase was not intended to be used in its most common sense. But if an unusual yet semantically permissible sense is urged, then the proponent of that abnormal usage must demonstrate why that is so.  ▇  As Sutherland put it, "[o]ne who questions the application of the plain meaning rule to a provision of an act must show either that some other section of the act expands or restricts its meaning, that the provision itself is repugnant to the general purview of the act, or that the act considered in pari materia with other acts, or with the legislative history of the subject matter, imports a different meaning." (2A Sutherland, Statutory Construction (Sands 4th ed. 1984 rev.) Literal Interpretation, § 46.01, p. 74, cited with approval in *Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665].)

---

[6] For all that, a contextual reading must still account for the words. Whether one calls it plain, literal, implicit, imputed, inferred, expansive, restrictive, et cetera, the reading must implant some permissible meaning into the statutory language. Courts cannot avoid the words used by ascribing a semantically impermissible meaning to them. Even in the context of familial relationships, "wife" cannot be read to mean "grandfather." One must always show that there is another semantically permissible application which, although it broadens or contracts the usual meaning, is still confined to the word. In this sense, a narrow literal meaning may be rejected in favor of a broad literal meaning and vice versa. What cannot be rejected, at least in the absence of legislative mistake, are the words themselves.

■■ The County advances a number of reasons why it believes the plain meaning of the statutory phrase should be disregarded. Implicit in all these arguments is the premise that departmental transfers, although technically not producing any "gross annual receipts," must nonetheless be treated like revenue generating sales. It begins by insisting that PGandE improperly *deducts* internal use of gas and electricity from its gross receipts and that deductions are improper in calculating gross receipts. But this begs the question. It is true that the use of the word "gross" means there should be no deductions from receipts. However, before the question of deductions arises it must first be shown that there were receipts. Since PGandE does not receive anything from the internal use of gas and electricity, it is not deducting anything for that internal usage. PGandE is simply not adding fictional receipts to its actual gross receipts.

The County places much emphasis on the fact that the PUC assigns a tariff to internal usage of gas and electricity which is used for ratemaking purposes. We find the PUC's ratemaking practices to be inconsequential. An analogous contention was made in *BMW of North America, Inc.* v. *New Motor Vehicle Bd.* (1984) 162 Cal.App.3d 980 [209 Cal.Rptr. 50]. There a motor vehicle dealer attempted to expand, and thereby controvert, the express terms of his franchise agreement by reference to internal planning mechanisms utilized by BMW. We said: "BMW is free to use whatever planning mechanisms it desires in determining how to market its products. But these internal considerations are not relevant and are not admissible to establish a meaning of a written contract where the written contract is not reasonably susceptible of the meaning urged." (At p. 993, citation omitted.) It is necessary for the PUC to assign a tariff to internal usage of gas and electricity in order to avoid requiring gas customers to subsidize electric customers through their rate structures. However, the PUC's ratemaking mechanisms do not result in the receipt of anything of value by PGandE for its internal usage of gas and electricity, and do not operate to alter or amend the statutorily prescribed franchise fees payable to the County.

The County asserts that PGandE performs its public utility functions in separate departments, and that its departments should be treated as separate entities. The County notes that if the departments were separate corporate entities they would be required to purchase gas and electricity from each other, thereby creating gross receipts which would be used to measure the franchise fees. However, the simple answer to this assertion is that the electric and gas departments of PGandE are not separate entities. PGandE is a single corporate entity which operates as a single, albeit departmentalized, entity. There are doubtlessly a myriad of differences between a single entity providing multiple types of utility services and separate entities providing single services. While there is some authority for treating separate

entities as a unit (*N. W. Pac. R. R.* v. *St. Bd. of Equalization, supra,* 21 Cal.2d at pp. 530-531; *So. Cal. Edison Co.* v. *State Board, etc.* (1934) 220 Cal. 420, 425 [31 P.2d 384]), the authorities do not support the County's claim that it can treat a single entity as multiple units simply because an advantage may be gained thereby.

The County notes that the franchise fee payable under the Broughton Act is a toll or a charge for the use of the franchise property. This toll, rather than being a tax or license on gross receipts, is designed to compensate the governmental entity for the use of public property. The County reasons that internal usage of gas and electricity requires the company to use the franchise property to obtain the gas and electricity and therefore a toll should be payable. The plain meaning of gross receipts, the argument runs, should be disregarded in order to prevent PGandE from obtaining a "free ride" when conveying gas and electricity for its internal use. It is true that the franchise fee is not a tax or license fee, but is a toll or charge for the use of the franchise property. (*County of Tulare* v. *City of Dinuba, supra,* 188 Cal. at p. 670.) However, the Legislature decreed that the fee should be based upon gross receipts arising from the use of the franchise property and no gross receipts are generated by internal usage of gas and electricity. The Legislature could have provided for alternative means of determining the franchise fee, such as a percentage of sales within the County, or by the volume of the usage of the franchise properties but it did not. (Cf. Pub. Util. Code, § 6231.) It chose instead to base the fee on "gross receipts," a measure obviously incompatible with the County's fee on use theory. In short, nothing in the statute itself or in the statutory scheme lends any credence to the construction urged by the County.

In summary, the County has not demonstrated why the Legislature intended the phrase "gross annual receipts" to be used in the abnormal sense of including nonreceipts. We are not at liberty to ignore the words used or to rewrite the statute to create fictional receipts in order to enhance the amount of the fees a franchisee must pay to the public agency. In brief, we are no more authorized to construe "receipts" to mean "unpaid value of use" than we are to construe "two percent" to mean "four percent." In view of this conclusion that portion of the judgment construing the calculation of the franchise fee under the statute cannot stand. It is therefore unnecessary to determine whether the trial court erred in concluding that the County did not waive its right to fees based upon internal usage of gas and electricity for the years 1973 through 1976.

## II

In its appeal the County contends that the trial court erred in determining that PGandE need not include investments in public utility

easements as investments in franchise property in determining the fees payable. We reject this contention as well.

The Broughton Act merely authorizes the County to grant a franchise to a public utility to use public streets and highways for public utility purposes. (Pub. Util. Code, § 6001.) ■ The franchise granted is not an authorization to do business in the County, or to use anything other than public streets and highways. (*Oro Electric Corp.* v. *R. R. Commission* (1915) 169 Cal. 466, 475-477 [147 P. 118].) The power to authorize a utility to do business in the County is reserved to the PUC (formerly the Railroad Commission). (*Ibid.*) The franchises granted under the Broughton Act are thus limited; they extend only to the right to use streets and highways over which the County has a proprietary interest. (*Ocean Park etc. Corp.* v. *Santa Monica* (1940) 40 Cal.App.2d 76, 86 [104 P.2d 668].) ■ Whatever regulatory or taxing power the County may have over other types of property, it may not claim a franchise fee for the use of nonfranchise property. (*Ibid.*) In determining the amount of franchise fees payable, it is not determinative whether rights exercised by the utility are considered private or public. The determinative factor is whether the utility obtained the right to use property by virtue of the franchises granted under the Broughton Act. (*Oakland* v. *Great Western Power Co.* (1921) 186 Cal. 570, 582-583 [200 P. 395].)

■ The question on appeal is whether the right to use public utility easements is included in the franchises granted by the County. We hold that it is not. Public utility easements arise from the terms of Government Code section 66475, which provides that as a condition of approving a subdivision map a local government may require the subdivider to dedicate real property for public utility easements. Such easements are not granted in the public streets and highways, but are upon the real property purchased by the purchasers of the subdivided lots. Neither the easements nor the servient estate are granted to the County; rather the easements are expressly dedicated to the public utility purposes. ■ It is fundamental that the language of a grant of an easement determines the scope of the easement. (*Wilson* v. *Abrams* (1969) 1 Cal.App.3d 1030, 1034 [82 Cal.Rptr. 272].) ■ Long ago our Supreme Court made clear the difference between public and private rights of way: "Public ways, as applied to ways by land, are usually termed 'highways' or 'public roads,' and are such ways as every citizen has a right to use. [¶] A private way relates to that class of easements in which a particular person, or particular description or class of persons, have an interest or right as distinguished from the general public." (*Kripp* v. *Curtis* (1886) 71 Cal. 62, 64 [11 P. 879], citation omitted.) ■ Public utility easements, by their express terms, define the class of persons who have an interest or right in the use of the easement, and these easements do not extend rights to the public in general or to the County in particular.

PGandE is in the class of persons for whom public utility easements were dedicated. Regardless of whatever regulatory rights the County has in public utility easements, PGandE obtained its rights to use such easements as a member of the class of grantees and not by virtue of its Broughton Act franchises. Accordingly, the trial court did not err in determining that PGandE need not pay franchise fees based upon gross receipts arising out of the use of public utility rights of way.

The judgment is reversed insofar as it holds that PGandE must include sums for internal usage of gas and electricity in its gross receipts in calculating the franchise fees payable to the County. In all other respects the judgment is affirmed, PGandE shall recover its costs on appeal.

Evans, Acting P. J., and Deegan, J.,* concurred.

A petition for a rehearing was denied July 27, 1987, and the petition of plaintiff and appellant for review by the Supreme Court was denied September 23, 1987. Panelli, J., did not participate therein.

---

* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.